*Decisions will be entered under Rule 50.*

GLENN E. EDGAR AND ELVA EDGAR, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3237–67, 3340–67, 3341–67, 2911–68—2926–68. Filed July 8, 1971.

---

[1] The proceedings of the following petitioners are consolidated herewith: W. R. Strain and Frances Strain, docket No. 3340–67; A. W. Strain (deceased) by Harriet Strain and Harriet Strain, docket No. 3341–67; W. R. Strain and Frances Strain, docket No. 2911–68; Harriet Strain, docket No. 2912–68; Arthur W. Strain, Jr., and Jacqueline M. Strain, docket No. 2913–68; Raymond P. Murphy and Mary Jean Murphy, docket No. 2914–68;

Footnote continued on following page.

718

Footnote continued from previous page.

George E. Hurd, Jr., and Katherine Hurd, docket No. 2915–68; William Russell Strain Trust No. CR–1, Brigham Young University, Trustee, docket No. 2916–68; William Russell Strain Trust No. CR–2, Brigham Young University, Trustee, docket No. 2917–68; Arthur W. Strain Trust No. CR–1, Brigham Young University, Trustee, docket No. 2918–68; Arthur W. Strain Trust No. CR–2, Brigham Young University, Trustee, docket No. 2919–68; Arthur Waldo Strain, Jr., Trust No. CR–1, Brigham Young University, Trustee, docket No. 2920–68; Katherine S. Hurd Trust No. CR–1, Brigham Young University, Trustee, docket No. 2921–68; Mary Jean Murphy Trust No. CR–1, Brigham Young University, Trustee, docket No. 2922–68; Glenn E. Edgar and Elva M. Edgar, docket No. 2923–68; G & E Trust No. CR–7007, Brigham Young University, Trustee, docket No. 2924–68; Glenn E. Edgar Trust No. CR–2002, Brigham Young University, Trustee, docket No. 2925–68; Glenn E. Edgar Trust No. CR–3003, Brigham Young University, Trustee, docket No. 2926–68.

*Stephen H. Anderson* and *Alonzo W. Watson, Jr.,* for the petitioners.

*Sidney U. Hiken* and *Leo A. McLaughlin,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioners' income tax and additions to tax under sections 6651(a) [2] and 6653(a) as follows:

| Docket No. | Taxable year | Amount | Additions to tax | |
|---|---|---|---|---|
| | | | Sec. 6651(a) | Sec. 6653(a) |
| 3237-67 | 1962 | $23,914.44 | | |
| | 1963 | 17,153.34 | | |
| 3340-67 | 1963 | 16,484.29 | | |
| 3341-67 | 1963 | 15,176.11 | | |
| 2911-68 | 1964 | 179,042.72 | | |
| 2912-68 | 1964 | 144,048.91 | | |
| 2913-68 | 1964 | 40,817.77 | | |
| 2914-68 | 1964 | 58,179.28 | | |
| 2915-68 | 1964 | 57,308.14 | | |
| 2916-68 | 1964 | 95,970.48 | $23,992.62 | |
| 2917-68 | 1964 | 87,267.20 | 21,816.80 | |
| 2918-68 | 1964 | 105,971.52 | 26,492.88 | |
| 2919-68 | 1964 | 40,478.31 | 10,119.57 | |
| 2920-68 | 1964 | 45,429.16 | 11,357.29 | |
| 2921-68 | 1964 | 58,971.44 | 14,742.86 | |
| 2922-68 | 1964 | 51,773.91 | 12,943.47 | |
| 2923-68 | 1964 | 138,812.74 | | $6,940.64 |
| 2924-68 | 1964 | 121,002.82 | 30,250.70 | |
| 2925-68 | 1964 | 5,591.70 | 1,397.92 | |
| 2926-68 | 1964 | 209.12 | 52.28 | |

The issues presented for decision are:

(1) Whether members of the Strain family (docket Nos. 2911–68 through 2915–68) or, in the alternative, trusts created by them (docket Nos. 2916–68 through 2922–68) had recognizable capital gain from the sale or exchange of stock in 1964.

---

[2] All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise noted.

(2) Whether William Russell Strain [3] and his wife, Frances Strain [4] (docket No. 2911-68), and Harriet Strain (docket No. 2912-68) or, alternatively, the William Russell Strain Trust No. CR-1 (docket No. 2916-68) and the Arthur W. Strain Trust No. CR-1 (docket No. 2918-68) had recognizable gain in 1964 as the result of the sale of stock subject to certain liens.

(3) Whether Glenn E. Edgar realized taxable income in 1964 as the result of a bargain purchase of stock which G & E Trust No. CR-7007, created by him, was allowed to make on condition that he arrange the sale of the stock of the Strain corporations; if so, whether the amount of such income is to be computed by reference to annuity tables (docket No. 2923-68) ; alternatively, whether G & E Trust No. CR-7007 realized short-term capital gain on the sale of the stock (docket No. 2924-68).

(4) Whether Glenn E. Edgar realized taxable income which is to be computed by reference to annuity tables as the result of transfers of cash and a duplex residence to Brigham Young University (docket No. 2923-68) ; alternatively, whether the Glenn E. Edgar Trust No. CR-2002 realized long-term capital gain on the sale of the duplex residence to Brigham Young University (docket No. 2925-68), and whether the Glenn E. Edgar Trust No. CR-3003 realized ordinary income in consideration of services performed by Glenn E. Edgar, the grantor of the trust (docket No. 2926-68).

(5) Whether Russell Strain (docket No. 3340-67) and Harriet Strain, on the joint return of herself and her deceased husband (docket No. 3341-67), are entitled to charitable contribution deductions for the remainder values of the stock in Strain Brothers, Inc., which they transferred to trusts in 1963.

(6) Whether Glenn E. Edgar is entitled to charitable contribution deduction for the remainder values of various items of property and cash which he transferred to trusts during 1962, 1963, and 1964 (docket Nos. 3237-67 and 2923-68).

(7) Whether Russell Strain ( docket No. 2911-68) and Harriet Strain (docket No. 2912-68) are entitled to charitable contribution deductions for amounts paid to certain privately controlled foundations during 1964.

(8) Whether Harriet Strain (docket No. 2912-68) is entitled to a charitable contribution deduction for 1964 for the value of a salary continuation agreement which she relinquished in connection with the sale of the stock of the Strain corporations to Brigham Young University.

---

[3] William Russell Strain is referred to in the petitions as W. R. Strain and is sometimes hereafter referred to as Russell Strain or Russell. In some of the documents filed with the Court, his name is spelled "Russel."

[4] Frances Strain is a party to these proceedings only because she filed a joint return with William Russell Strain and will not be referred to as a party to the various transactions involved in these proceedings.

(9) Whether Russell Strain (docket No. 3340–67) and Harriet Strain (docket No. 3341–67) realized a constructive dividend in 1963 as a result of the transfer of the Strain Ranch to certain privately controlled foundations.

(10) Whether Raymond P. Murphy and Mary Jean Murphy (docket No. 2914–68) have established that they suffered a capital loss during 1964.

(11) Whether Glenn E. Edgar, as grantor and income beneficiary of the Glenn E. Edgar Trust Nos. CR–1 and CR–2, is entitled to deductions for 1962, 1963, and 1964 for losses incurred by partnerships in which the trusts were limited partners (docket Nos. 3237–67 and 2923–68).

(12) Whether the trust petitioners' failure to file timely income tax returns for 1964 was "due to reasonable cause and not due to willful neglect" within the meaning of section 6651(a)(1); and

(13) Whether the underpayment of income tax by Glenn E. Edgar and Elva Edgar for 1964 was due to "negligence or intentional disregard of rules and regulations" within the meaning of section 6653(a).

FINDINGS OF FACT

*General*

Petitioners' legal residences or their principal places of business at the time they filed their petitions and the places where they filed their Federal income tax returns are as follows:

| Docket No. | Name | Taxable year | Residence at time of filing petition | Place where tax return was filed |
|---|---|---|---|---|
| 3237–67 | Glenn E. Edgar and Elva Edgar (husband and wife). | {1962} {1963} | Salt Lake City, Utah | Salt Lake City, Utah. |
| 3340–67 | W. R. Strain and Frances Strain (husband and wife) | 1963 | Great Falls, Mont. | Helena, Mont. |
| 3341–67 | A. W. Strain (Deceased) by Harriet Strain and Harriet Strain | 1963 | Great Falls, Mont. | Helena, Mont. |
| 2911–68 | W. R. Strain and Frances Strain (husband and wife) | 1964 | Great Falls, Mont. | Helena, Mont. |
| 2912–68 | Harriet Strain | 1964 | Great Falls, Mont. | Helena, Mont. |
| 2913–68 | Arthur W. Strain, Jr., and Jacqueline M. Strain (husband and wife) | 1964 | Great Falls, Mont. | Helena, Mont. |
| 2914–68 | Raymond P. Murphy and Mary Jean Murphy (husband and wife) | 1964 | Alexandria, Va. | Albany, N.Y. |
| 2915–68 | George E. Hurd, Jr., and Katherine Hurd (husband and wife) | 1964 | Kailua, Hawaii | Honolulu, Hawaii. |
| 2916–68 | William Russell Strain Trust No. CR–1, Brigham Young University, trustee | 1964 | Provo, Utah | Salt Lake City, Utah. |
| 2917–68 | William Russell Strain Trust No. CR–2, Brigham Young University, trustee | 1964 | Provo, Utah | Salt Lake City, Utah. |
| 2918–68 | Arthur W. Strain Trust No. CR–1, Brigham Young University, trustee | 1964 | Provo, Utah | Salt Lake City, Utah. |
| 2919–68 | Arthur W. Strain Trust No. CR–2, Brigham Young University, trustee. | 1964 | Provo, Utah | Salt Lake City, Utah. |
| 2920–68 | Arthur Waldo Strain, Jr., Trust No. CR–1, Brigham Young University, trustee. | 1964 | Provo, Utah | Salt Lake City, Utah. |

| Docket No. | Name | Taxable year | Residence at time of filing petition | Place where tax return was filed |
|---|---|---|---|---|
| 2921-68 | Katherine S. Hurd Trust No. CR-1, Brigham Young University, trustee. | 1964 | Provo, Utah | Salt Lake City, Utah. |
| 2922-68 | Mary Jean Murphy Trust No. CR-1, Brigham Young University, trustee. | 1964 | Provo, Utah | Salt Lake City, Utah. |
| 2923-68 | Glenn E. Edgar and Elva M. Edgar (husband and wife) | 1964 | Salt Lake City, Utah | Salt Lake City, Utah. |
| 2924-68 | G & E Trust No. CR-7007, Brigham Young University, trustee. | 1964 | Provo, Utah | Salt Lake City, Utah. |
| 2925-68 | Glenn E. Edgar Trust No. CR-2002, Brigham Young University, trustee. | 1964 | Provo, Utah | Salt Lake City, Utah. |
| 2926-68 | Glenn E. Edgar Trust No. CR-3003, Brigham Young University, trustee. | 1964 | Provo, Utah | Salt Lake City, Utah. |

## Issues 1–3. Sale of the Strain Corporations Including the Assumption of Liabilities and the Compensation of Edgar

For many decades prior to 1960, Russell Strain and his brother, Arthur Waldo Strain,[5] managed successful business enterprises, owned by three family corporations, in downtown Great Falls, Mont. The three corporations were Strain Brothers, Inc. (hereafter Strain Brothers), Monarch Loan & Mortgage Co., and Monarch Warehouses, Inc. These corporations are herein sometimes referred to collectively as the Strain corporations.

In 1960, Russell and Arthur were in their sixties. Russell had suffered a stroke, and Arthur's health was not good. Together, they owned a majority of the stock of Strain Brothers, but they lacked voting control of Monarch Loan & Mortgage Co. and Monarch Warehouses, Inc. They feared that, on the death of either one of them, the stock of the Strain corporations would pass into the hands of strangers or uncooperative relatives and that the survivor would thereby lose management control of the companies.

Russell and Arthur started looking for a way to preserve control of the corporations and to plan the future handling of their estates. To assist them, they retained Glenn E. Edgar (hereafter Edgar), a lawyer and business consultant, and Herman L. Wood (hereafter Wood), a certified public accountant. The first meeting with Edgar and Wood took place in October of 1961. At this meeting and at numerous subsequent meetings, Russell and Arthur outlined the management and estate problems they were facing. During these discussions, Arthur firmly rejected any possibility of selling the Strain corporations, and that possibility was not pursued. Arthur was hopeful that his son would eventually become manager of the corporations.

With the help of Wood, Edgar developed a plan designed to place control of all the Strain corporations in the hands of Russell and

---

[5] Arthur Waldo Strain is referred to in the petitions as A. W. Strain and Arthur W. Strain and is sometimes hereafter referred to as Arthur.

Arthur, to minimize their estate taxes, and to avoid probate of their estates. This plan envisioned the creation of numerous trusts of which Russell and Arthur were to serve as trustees; various members of the Strain families were to be designated as life beneficiaries; two private foundations, one to be controlled by Russell's family and the other by Arthur's family, were to be created, and one of the foundations was to be named remainderman of each of the various trusts. The plan further called for salary continuation agreements to provide life income for the widows of Russell and Arthur. Late in 1962, Russell and Arthur approved this plan and directed Edgar and Wood to take steps to put it into effect.

For 2 weeks, early in June of 1963, Edgar and Wood worked with Russell and Arthur, reviewing the papers required for the creation of the trusts. On June 6, 1963, the William Russell Strain Foundation and the Arthur W. Strain Foundation were organized as nonprofit corporations; certificates of incorporation were issued for these foundations by the State of Nevada on July 9, 1963. On June 17, 1963, members of the Strain family who held stock in the Strain corporations created irrevocable charitable remainder trusts, designating successive life beneficiaries and remainderman as follows:

| Trust | Life Beneficiary | Remainderman |
|---|---|---|
| William Russell Strain Trust No. CR–1 | William Russell Strain<br>Frances S. Strain<br>Katherine S. Hurd<br>Richard Douglas Hurd and Kathleen F. Hurd (in equal shares) | William Russell Strain Foundation. |
| William Russell Strain Trust No. CR–2 | William Russell Strain<br>Frances S. Strain | William Russell Strain Foundation. |
| Katherine S. Hurd Trust No. CR–1 | Katherine S. Hurd | William Russell Strain Foundation. |
| Arthur W. Strain Trust No. CR–1 | Arthur W. Strain<br>Harriet Strain<br>On their deaths, one-half to each: Arthur Waldo Strain, Jr., and Mary Jean S. Murphy. On Arthur, Jr.'s death, his share to his children: Sharon Anne Strain, Cynthia Strain and Arthur Waldo Strain III. On Mary's death, her share to her children: Karen Lee Murphy and Brian Timothy Murphy. | Arthur W. Strain Foundation |
| Arthur W. Strain Trust No. CR–2 | Arthur W. Strain<br>Harriet Strain | Arthur W. Strain Foundation. |
| Arthur Waldo Strain, Jr., Trust No. CR–1 | Arthur Waldo Strain, Jr | Arthur W. Strain Foundation. |
| Mary Jean S. Murphy Trust No. CR–1 | Mary Jean S. Murphy | Arthur W. Strain Foundation. |

In each trust instrument,[6] Russell and Arthur were named as co-trustees, and in this capacity they were given power to change the designated remainderman by naming "either a hospital, church or school, which is a tax exempt organization under the Federal Tax laws, to receive * * * [the] corpus upon the death of" the last income beneficiary.

Each trust provided that the "entire annual net income of the Trust Estate shall be distributed" to the designated life income beneficiaries. The trust instruments further provided that:

All capital gains and losses of the Trust, extraordinary stock dividends and capital gain dividends of investment companies shall be considered principal. Any other determination of what is principal or income of the Trust Estate and the apportioning and allocating of receipts and disbursements between these accounts shall be governed by Federal Income Tax laws then in effect.

Each trust instrument further provided for the selection of trustees as follows:

The original Trustees, * * * [Russell and Arthur] or the survivor of them, may at all times while serving hereunder vary and determine the number of Trustees required to serve this Trust and they may at all times while serving hereunder appoint and discharge any of them.

If said survivor should become unwilling, unable or decline to continue to act as Trustee, the number and members of the board of trustees thereafter shall be as determined by an instrument in writing made by said survivor and delivered to the then remaining trustees (or to any beneficiary hereunder if for any reason there shall be no trustee then serving). Said survivor shall at all times while serving hereunder have the right to revoke, withdraw, modify or amend such instrument.

If at any time there is no Trustee serving hereunder and no provision is otherwise made herein to fill such vacancy, a court of proper jurisdiction shall appoint either an individual or corporation to act as sole Trustee during said period.

The trustees were also given the power to retain or sell the stock in the Strain corporations and to vote it for any purpose.

All the outstanding shares of stock of the Strain corporations were transferred to these seven trusts (hereafter the Strain trusts) with the exceptions of two shares of Strain Brothers stock owned by Marie Hegener and S. A. Lerum, redeemed by the corporation in October of 1963; 343 shares held in an oral trust for Richard Hurd; 342 shares held in an oral trust for Kathleen Strain Hurd; and 186 shares held by G & E Trust CR-7007.

---

[6] For simplicity, the "No." in the names of each of the Strain trusts will hereafter be omitted. Also, to avoid cumbersome repetition, the William Russell Strain Trust CR-1 and William Russell Strain Trust CR-2 are sometimes herein referred to, respectively, as the CR-1 and CR-2 trusts created by Russell, or Russell's CR-1 and CR-2 trusts. Similarly, the Arthur W. Strain Trust CR-1 and Arthur W. Strain Trust CR-2 are sometimes herein referred to, respectively, as the CR-1 and CR-2 trusts created by Arthur, or Arthur's CR-1 and CR-2 trusts.

All the documents required for the creation of the trusts were properly executed; all the stock was transferred on the books of the corporations; and a separate file for each trust was set up in the office of the trustees. The trusts became effective June 17, 1963.

On June 10, 1963, prior to the creation of the trusts, Russell and Arthur received $24,000 and $41,000, respectively, from Strain Brothers. To document these receipts, Russell and Arthur each signed a promissory note, which bore no interest and was payable to the order of Strain Brothers on a date 75 years thereafter. Stock of Russell and Arthur in Strain Brothers was pledged to secure the payment of these notes, and liens were endorsed on the stock certificates. The stock certificates issued to William Russell Strain Trust CR–1 and to Arthur W. Strain Trust CR–1 stated that they were subject to those liens, but the trusts did not assume the liability on the notes.

During 1962, Edgar was given checks totaling $10,000 which fully compensated him for his services in planning the trusts.

During the 2 weeks in June of 1963, when the trusts were being established, Russell and Arthur again discussed with Edgar and Wood the possibility of selling the stock in the Strain corporations. Arthur was not at this time enthusiastic about selling it, but the Strains agreed that Edgar and Wood would explore the possibilities of a sale. To compensate Edgar for his services, Russell and Arthur each agreed to sell 93 shares of Strain Brothers stock, having a fair market value at the time of $28,125, to Edgar's G & E Trust CR–7007 for $50.

On June 10, 1963, Edgar created G & E Trust CR–7007 and transferred $110 in cash to it for the purpose of purchasing the stock in Strain Brothers. The terms of this trust were similar, in principle, to those of the Strain trusts. Under the declaration of trust, he and Wood were designated as trustees. Edgar reserved all the income for his life and that of his wife, and provided that the remainder was to go to the Primary Children's Hospital of Salt Lake City, Utah. However, Edgar reserved for the trustees the power to substitute some other tax-exempt hospital, church, or school as the remainderman.

The purchase agreement between the trustees of G & E Trust CR–7007 and Russell provided:

Notwithstanding the foregoing W. R. Strain [i.e., Russell] shall have the option to purchase said shares of stock from said Trustees at any time or times within a period of 18 months after the date of execution of this agreement upon paying to said Trustees the sum of $50.00 in cash; provided, however, should W. R. Strain within said period of time sell to a third party any of his remaining shares of common capital stock of Strain Bros. said option shall terminate and said Trustees shall have the right to sell said 93 shares of stock to said third party at a price to be agreed upon by said Trustees and said third party.

The agreement between Arthur and G & E Trust CR–7007 was identical except for the name of the seller.

Prior to June 17, 1963, there were no existing contracts of sale, prior understandings, or commitments of any kind with respect to the sale of the assets or stock of the Strain corporations. No contacts of any kind had been made by any person connected with the Strain family or G & E Trust CR–7007 with anyone regarding such sale.

On about June 19, 1963, a few days after Edgar and Wood were asked to investigate the possibility of a sale, Graham Doxey (hereafter Doxey) visited Wood's office on some personal business. During this visit, Edgar and Wood talked with him about the stock. Doxey thought that Zion Securities Corp. (hereafter Zion Securities) might be interested in purchasing it. Shortly thereafter, at an executive committee meeting, he proposed that the company purchase the stock. After consideration and investigation, the proposal was rejected.

In late August of 1963, the proposal which had been rejected by Zion Securities was communicated to the Corporation of the President of the Church of Jesus Christ of Latter-Day Saints and through it to representatives of Brigham Young University (hereafter BYU). Ben E. Lewis, vice president of BYU, contacted Wood for details.

After extended negotiations, an agreement with BYU was reached for the purchase and sale of the stock, and the transaction was completed in January of 1964. The total purchase price agreed upon was $1,394,587.60 for all the outstanding stock in the three Strain corporations. Each of the Strain trusts and G & E Trust CR–7007 executed a separate agreement with BYU with respect to its stock.

All of the agreements of purchase and sale were basically the same, except for numbers of shares sold and amounts to be paid. Each agreement provided for the principal amount to be paid after 75 years, but BYU was given the option to accelerate this payment after the death of the last life income beneficiary. In the interim, interest was payable quarterly. The annual interest rates were 10 percent for all the Strain Trusts CR–1 and G & E Trust CR–7007; 3.78 percent for the Arthur W. Strain Trust CR–2; and 7.75 percent for the William Russell Strain Trust CR–2 until Russell's death and, thereafter, 3.42 percent. Each agreement also provided:

The Notices of Breach of Warranty. There shall be deducted from the purchase price such amounts as may be specified in any written notices of breach of warranty given by Buyer to Seller and approved on behalf of Seller by such persons who under the terms of the instrument establishing Seller have interests as lifetime beneficiaries and have reached their majority. Such notices of breach of warranty must specify the breach of one or more of the warranties or representations set forth in this agreement and the amount estimated by Buyer as the damage resulting, or which may result, from the breach thereof.

In the event the said lifetime beneficiaries of Seller shall not approve in writing the amount specified in such notices of breach of warranty, the respective rights of the parties hereunder shall be determined by arbitration, each

party, Buyer and Seller, to choose one arbitrator and the two arbitrators so chosen to appoint a third arbitrator and the decision of any two of said three persons to be final and binding upon both Buyer and Seller. The purchase price, as well as the interest payments provided for in Paragraph 2(b) hereof shall be adjusted to reflect the decision of the arbitrators and a copy of the arbitrators' decision shall be annexed to and become a part of this agreement. In the event a claimed breach of warranty or representation cannot be resolved by arbitration as herein provided, recourse may be had to the courts.

Included in all the agreements were warranties that corporate balance sheets attached thereto were accurate and that "The title of Seller to said shares is free of any lien, charge or encumbrance and Buyer, on the closing date, will receive good and absolute title thereto free of any liens, charges or encumbrances thereon." However, the agreements with William Russell Strain Trust CR-1 and the Arthur W. Strain Trust CR-1 contained an exception to the latter warranty with respect to the liens securing the repayment of the loans by Strain Brothers to Russell and Arthur in the respective amounts of $24,000 and $41,000, evidenced by the promissory notes dated June 10, 1963. The agreement with Russell's CR-1 trust provided:

should the said promissory note be due and payable on the date Buyer is obligated to pay the principal amount due hereunder, Buyer may at its option and upon giving written notice of exercise reduce the amount of its principal payment by an amount equal to the amount of said note.

A similar provision appeared in the agreement with Arthur's CR-1 trust.

The element of the transaction which was most attractive to BYU was its designation as the charitable remainderman of each of the trusts. All the agreements provided:

*Designations.* (a) Trustee hereby agrees to designate Buyer as the Charitable Remainderman of Seller, such designation to take effect in the future upon the death of Trustee or upon a date which is ninety (90) days from the closing date. The Trustee shall deliver to Ray, Quinney & Nebeker, on the closing date a valid, enforceable and irrevocable designation of Buyer for delivery, in accordance with the terms of the instrument creating Seller when said designation becomes effective.

(b) Trustee agrees to irrevocably appoint Buyer or Buyer's nominee as sole Trustee of Seller. Said designation to be made and become effective ninety-five (95) days from the closing date, unless Trustee's death occurs prior to the expiration of the 95-day period. Trustee hereby and herewith irrevocably designates and appoints Buyer as the sole Trustee of Seller upon Trustee's death, if such death should predate a date which is 95 days from the closing date. Buyer agrees that it will not charge any fee for its services as Trustee of Seller and that it will not select a nominee or successor trustee unless such nominee or successor agrees in writing to serve as trustee without remuneration from Seller.

(c) Trustee warrants that he has the right and authority as sole Trustee of Seller to make the designations and appointments set forth in Sections (a) and

728

(b) of this paragraph 12. Trustee and Seller specifically agree that a failure of either of the two said designations and appointments shall give Buyer a right to declare a breach of this agreement and thereby relieve itself of its obligation under the terms of this agreement and entitle it to recover its costs and expenses, including reasonable attorney's fees.

At the insistence of Russell and Arthur, the obligations of BYU under the agreements were guaranteed by the Corporation of the President of the Church of Jesus Christ of Latter-Day Saints.

Estimates prepared for BYU during the course of the negotiations leading to the sale indicated that the total annual interest payments under the agreements would approximate $106,000. This amount was somewhat less than the projected net rental income of $122,000 per year from the property, without regard to an estimated deduction for depreciation in the amount of $30,978.33 per year.

After the sale was completed, BYU caused each of the three Strain corporations to be liquidated, and it assumed direct ownership and management of the assets, maintaining its books and records accordingly. On its records, BYU treated the annual payments to the Strain trusts as interest and the obligations to make principal payments as debts. However, the promissory notes issued by Russell and Arthur to Strain Brothers on June 10, 1963, in the amounts of $24,000 and $41,000, respectively, do not appear among the "Strain Properties" assets on the books of BYU.

Arthur died September 6, 1963, and his estate was not formally administered.

The ages of the life income beneficiaries of the trusts as of their respective birthdays closest to January 3, 1964, the date of the sales to BYU, were as follows:

| | | | |
|---|---|---|---|
| Russell Strain | 71 | Karen Lee Murphy | 12 |
| Frances Strain | 66 | Brian Timothy Murphy | 11 |
| Katherine S. Hurd | 46 | Sharon Anne Strain | 9 |
| Richard Douglas Hurd | 22 | Cynthia Strain | 7 |
| Kathleen F. Hurd | 21 | Arthur Waldo Strain III | 4 |
| Harriet Strain | 68 | Glenn E. Edgar | 45 |
| Mary Jean Murphy | 40 | Elva Edgar | 44 |
| Arthur Waldo Strain, Jr. | 38 | | |

Respondent determined that each of the individual settlors of the Strain trusts sold or exchanged stock in the Strain corporations to BYU for an annuity and thereby realized long-term capital gains during 1964. The amounts of the capital gains were computed by applying the 4-percent annuity tables to ascertain the value of each of the annuities. Respondent further determined that the "interest" income reported by each of the individuals was, in fact, received as an annuity, and a portion of it was to be excluded from income under

the formula prescribed by section 72(b). Alternatively, respondent determined that each of the seven Strain trusts sold or exchanged stock to BYU for annuities for their respective life beneficiaries and thereby realized long-term capital gains.

With regard to Russell and Harriet (Arthur's widow), respondent also determined that "in the same transaction Brigham Young University assumed a liability * * * to Strain Brothers, Inc." in the respective amounts of $24,000 and $41,000, i.e., the notes of June 10, 1963, referred to above, and included these amounts in the computation of the gain determined to have been realized by each of them on the sale of stock in 1964. Alternatively, in respect of William Russell Strain Trust CR–1 and Arthur W. Strain Trust CR–1, respondent determined that "Brigham Young University assumed a liability * * * [of theirs] to Strain Brothers, Inc." in the amounts referred to above, and included these liabilities in computing the amount realized by each trust.

Further, respondent determined that Edgar's income should be "increased $180,905.00 representing the fair market value of capital stock of Strain Brothers, Inc., received by * * * [him] in return for services rendered. In June 1963, * * * [he] received for the sum of $100.00 this stock subject to an option that it could be re-purchased for this same amount; on or about January 3, 1964, this option terminated and * * * [he] realized income." Alternatively, respondent determined that G & E Trust CR–7007 "sold or exchanged 186 shares of common stock in Strain Brothers, Inc., and received from Brigham Young University an annuity with a present value of $181,005.00." He further determined that such value represented short-term capital gain of $180,905 on the ground that the stock which the trust had purchased for $100 was not held for more than 6 months.

### Issue 4. Sale of Duplex and Loan of Money—Edgar Trusts CR–2002 and CR–3003

On January 2, 1963, Edgar created the Edgar Trust No. CR–2002 [7] and caused a duplex, a two-family residential rental property, having a fair market value of $34,500 to be conveyed to it. He reserved the income from the trust for his life and thereafter for the life of his wife. The trust provided for the following disposition of the remainder on the death of the survivor of Edgar and his wife:

The entire corpus of the Trust Estate shall be distributed free of trust to the Church of Jesus Christ of Latter Day Saints of Salt Lake City, Utah. Should

[7] For simplicity, the "No." in the names of each of the trusts created by Edgar is omitted herein. For similar reasons, Edgar Trust No. CR–2002 and Edgar Trust Co. CR–3003, referred to in the petitions as Glenn E. Edgar Trust No. CR–2002 and Glenn E. Edgar Trust No. CR–3003, will be referred to herein as Edgar Trust CR–2002 and Edgar Trust CR–3003, respectively.

said Church of Jesus Christ of Latter Day Saints be not then a tax exempt organization under the Federal Tax laws then in effect, such corpus shall be distributed to such Federal tax exempt hospital, church or school as a court of proper jurisdiction shall determine will carry out the purposes of this Trust.

Notwithstanding the foregoing the Settlor at any time prior to December 31, 1963 may designate by an instrument in writing and delivered to the Trustees who are then serving this Trust, either a hospital, church or school, which is a tax exempt organization under the Federal Tax laws, to receive said corpus upon the death of said survivor. Such designation by the Settlor shall be in lieu of said designation of corpus to said Church of Jesus Christ of Latter Day Saints. Such designation shall be irrevocable and shall be conclusive and binding upon all parties in interest. Should the hospital, church or school so designated by the Settlor be not a tax exempt organization under the Federal Tax laws at the time of said survivor's death, such corpus shall be distributed to such Federal Tax exempt hospital, church or school as a court of proper jurisdiction shall determine will carry out the purposes of this Trust.

On September 17, 1963, Edgar created another charitable remainder trust, the Edgar Trust CR–3003. He irrevocably transferred to this trust stocks having a fair market value of $17,325.82, reserving the income therefrom for his life and that of his wife and designating the remainderman under a provision identical with the one quoted above from Edgar Trust CR–2002.

On October 17, 1963, Edgar approached Lewis of BYU with the proposal that the assets of these two trusts be transferred to BYU and that BYU be designated as the charitable remainderman. Lewis recommended that BYU accept the proposal, and it did so. Edgar, on November 16, 1963, irrevocably designated BYU as the charitable remainderman of each of these trusts.

On January 2, 1964, Edgar Trust CR–2002 sold the duplex residence to BYU for $34,500. The purchase price was to be paid in a lump sum on December 31, 2010, with interest thereon to be paid quarterly during the interim at the rate of 8 percent per annum. On the same day the trustees of Edgar Trust CR–2002 resigned and appointed BYU as successor trustee.

In the spring of 1964, the stocks, which were the corpus of Edgar Trust CR–3003, were sold. On June 1, 1964, the trust loaned $17,500 to BYU. The loan is evidenced by a promissory note payable in a lump sum on June 1, 2010, with interest thereon payable quarterly during the interim at the rate of 7 percent per annum.

Respondent determined that, during 1964, Edgar "exchanged a duplex * * * to Brigham Young University for an annuity * * * resulting in a capital gain." The value of the annuity was computed by applying 4-percent annuity tables to the annual interest payment; the gain was measured by the difference between the value so computed and Edgar's basis for the duplex. He also determined that Edgar "realized taxable income of $12,064.15 representing the excess of the

present value of an annuity * * * [he] received from the Brigham Young University over the cost to * * * [him] of purchasing the annuity [$17,500], because * * * [he] received this income in return for services rendered."

Respondent, alternatively, determined that, during 1964, Edgar Trust CR–2002 sold or exchanged the duplex residence, property used in a trade or business, for an annuity and realized income taxable as long-term capital gain under section 1231(b), computed in the same manner as in the determination with respect to Edgar's liability on this transaction. As to Edgar Trust CR–3003, respondent, alternatively, determined that it "realized ordinary income * * * representing the excess of the present value of an annuity * * * [it] received from the Brigham Young University over the cost to * * * [it] of purchasing the annuity because * * * [it] received this income in return for services rendered to Brigham Young University by" Edgar. However, respondent further determined that this trust was "entitled to a deduction for distributions to beneficiaries" equal to the amount of income realized.

*Issue 5. Deductions for Charitable Remainders—Russell and Arthur Strain Trusts*

Each of the trust instruments signed by Russell (William Russell Strain Trusts CR–1 and CR–2) and Arthur (Arthur W. Strain Trusts CR–1 and CR–2) on June 17, 1963, contained substantially similar provisions relating to the remainder interests. After reserving certain life interests, the trusts created by Russell provided:

Upon the death of the survivor of * * * [the life beneficiaries] * * * :

The entire corpus of the Trust Estate shall be distributed free of trust to the William Russel Strain Foundation, a non-profit corporation organized under the laws of the State of Nevada. Should said Foundation be not then a tax exempt organization under the Federal Tax laws then in effect, such corpus shall be distributed to such Federal tax exempt hospital, church or school as a court of proper jurisdiction shall determine.

Notwithstanding the foregoing, Arthur W. Strain and William Russel Strain, or the survivor of them, while serving as Trustees hereunder, may designate by an instrument in writing and delivered to the Settlor (or to any beneficiary hereunder if for any reason the Settlor shall be not then living) either a hospital, church or school, which is a tax exempt organization under the Federal Tax laws, to receive said corpus upon the death of said survivor. Such designation shall be in lieu of said designation of corpus to said Foundation. Such designation by Arthur W. Strain and William Russel Strain, or the survivor of them, shall be irrevocable and shall be conclusive and binding upon all parties in interest.

If either of said Trustees, Arthur W. Strain and William Russell Strain, shall at any time be absent from the State of Montana or become mentally or physically incapacitated for the performance of his duties, it shall not be necessary for him to resign or to be removed in order that the power to designate a tax exempt

organizartion herein granted be executed, but the other Trustee may execute said power during such absence or incapacity as though the Trustee so absent or incapacitated were dead and had no successor.

The provisions in Arthur's trusts were identical to this one, except that they named as remainderman the Arthur W. Strain Foundation. On December 20, 1963, with regard to Arthur's CR–1 trust, and on January 3, 1964, with regard to the other three trusts, Russell, after Arthur's death, exercised his powers to designate an exempt "hospital, church or school" to receive the remainder interests by naming BYU.

In their 1963 income tax returns, Russell and Harriet (in her joint return with Arthur) each deducted as charitable contributions the values of the remainder interests in the stock transferred in trust to the extent of 30 percent of their adjusted gross incomes. Respondent disallowed the deductions.

### *Issue 6. Deductions for Charitable Remainders—Edgar Trusts*

On May 22, 1962, Edgar transferred a vacant lot to his existing irrevocable Edgar Trust CR–1. Under the terms of this trust the net income was reserved to Edgar for life and was then payable to his father for life. On the death of the last income beneficiary, the trust instrument provides:

the entire corpus of the Trust Estate shall be distributed free of trust to the Primary Children's Hospital of Salt Lake City, Utah. If such distribution shall be impossible of attainment, then the funds available for distribution shall be distributed to the Church of Jesus Christ of Latter Day Saints of Salt Lake City, Utah. If such distribution shall be impossible of attainment, then the funds available for distribution shall be applied by the Trustee to such similar charitable purpose as a court of proper jurisdiction shall determine will most nearly fulfill the general charitable purpose.

The fair market value of the lot on the date of the transfer was $10,500, and the value of the remainder interest was $4,144.35.

Edgar created the Edgar Trust CR–1001 on December 27, 1962, and had his personal residence and one share of stock in the Big Cottonwood Green Ditch Irrigation Co. transferred to it. The trust instrument reserves the "right to use, occupancy and enjoyment" of the residence for Edgar's life and that of his wife, and then provides:

Upon the death of the survivor of the Settlor and said Elva Martin Edgar, the entire corpus of the Trust Estate shall be distributed free of trust to the Primary Children's Hospital of Salt Lake City, Utah. If for any reason said hospital be not then enjoying a tax exempt status under the Federal Income tax laws then in effect, the Trustees shall distribute said corpus free of trust to a similar hospital which is then enjoying a tax exempt status under said laws as a court of proper jurisdiction shall determine.

The property had a fair market value at the time of the transfer of $73,000, and the value of the remainder interest was $22,794.98. Edgar claimed deduction for the remainder interests.

As previously mentioned, Edgar created the Edgar Trust CR–2002 on January 2, 1963, and transferred to it a duplex having a fair market value of $34,500. He created Edgar Trust CR–3003 on September 17, 1963, and transferred to it a stock account having a fair market value of $17,325.82. He had acquired this stock in consideration of an agreement to pay an annuity with a value of $17,316.35 to his father, 78 years of age. In each of these trust instruments, Edgar reserved the income for his life and that of his wife and designated The Church of Jesus Christ of Latter Day Saints as the charitable remainderman. The instrument also provided that Edgar could substitute some other tax-exempt church, school, or hospital as the remainderman. The instruments further provided:

Should [either The Church of Jesus Christ of Latter Day Saints or the tax exempt charitable organization substituted for it] be not a tax exempt organization under the Federal tax laws at the time of said survivor's death, such corpus shall be distributed to such Federal tax exempt hospital, church or school as a court of proper jurisdiction shall determine will carry out the purposes of this Trust.

The values of the remainder interests in these trusts were $10,772.97 and $5,580.13, respectively, of which Edgar deducted $11,012.79 in his tax return for 1963.

In May of 1964, Edgar transferred an additional $967.18 in cash to Edgar Trust CR–3003, and in September of that year he created yet another trust, Glenn E. Edgar Trust CR–4004.[8] The corpus of this latter trust consisted of $2,500 in cash. This trust, like most of his others, reserved the income for his life and that of his wife with the remainder to go to a tax-exempt charity, in this case the Primary Children's Hospital of Salt Lake City. In January of 1964, Edgar and his wife were respectively 45 and 44 years of age. The values of the remainder interests in these contributions were $311.50 and $805.18, respectively, a total of $1,116.68.

Respondent determined that Edgar is not entitled to the claimed charitable contribution deductions for the remainder interests of these trusts for any of the years 1962, 1963, or 1964.

*Issue 7. Contributions to Strain Foundations—Russell Strain and Harriet Strain*

In their returns for 1964, Russell and Harriet claimed charitable deductions for amounts contributed to the William Russell Strain Foundation and the Arthur W. Strain Foundation, respectively. As noted above, these foundations were formed as nonprofit corporations under the laws of Nevada. Their articles of incorporation are iden-

---

[8] For simplicity, this trust will herein be referred to as Edgar Trust CR–4004.

tical, with the exception of the names, and the foundations have engaged in identical activities.

Article III of their respective articles of incorporation describes the purposes of the corporations as follows:

*Purposes:* This corporation shall be exclusively a religious, charitable, scientific, literary and educational non-profit corporation, no part of the net earnings of which shall inure to the benefit of any private members or individuals. This corporation shall not engage in carrying on propaganda or otherwise attempt to influence legislation and shall not participate in or intervene in (including the publishing or distribution of statements) any political campaign on behalf of any candidate for public office.

The executive boards of the corporations were composed exclusively of members of the Strain family. The board members of the William Russell Strain Foundation were Russell, his wife, and daughter, and the board members of the Arthur W. Strain Foundation were Arthur, his wife, son, and daughter. Membership in the foundations was controlled by their respective executive boards.

In October of 1963, certain properties in Montana variously referred to as the Monarch Dairy Farm and the Strain Ranch (hereafter Strain Ranch) were transferred to the two foundations. Located on the property were the summer homes of Russell, Arthur, and their mother; a cabana, and a swimming pool. After this property was transferred to the foundations, the Strains paid a total rental of $1,225 in each of the years 1964 and 1965 for the use of the houses and recreational facilities; no similar payments were made thereafter. The foundations did not make any substantial cash contributions to charities during 1963 or 1964.

The operations of the Strain Ranch resulted in a net loss during each of the years 1963 and 1964. The foundations, therefore, required additional money to continue to operate and preserve the Strain Ranch. During 1964, Russell and Harriet respectively contributed $4,262 and $4,105.08 to the foundations and claimed these amounts as deductions for charitable contributions in their 1964 tax returns. Respondent disallowed the deductions.

### Issue 8. Salary Continuation Agreement

On June 11, 1963, as a part of the estate and management plan prepared for Russell and Arthur, salary continuation agreements were entered into between Strain Brothers and Russell and Arthur. Under these agreements, Strain Brothers promised to pay the widows of Russell and Arthur $1,000 per month for life.

Upon Arthur's death, on September 6, 1963, Harriet commenced receiving the monthly payments of $1,000. Then, on January 2, 1964,

as an integral part of the sale of the stock of the Strain corporations, Harriet "assigned" the agreement, having a value of $102,001, to BYU. Harriet claimed the value of the agreement as a charitable contribution deduction in her 1964 income tax return, subject to the percentage limitation on charitable contribution deductions. Respondent disallowed the deduction.

## Issue 9. Dividend from Strain Brothers

The Strain Ranch consists of several, mostly contiguous, parcels of land in Cascade County, Mont. Most of these parcels were at one time owned by the Strain Realty Co. but, between 1931 and 1940, prior to the merger of Strain Realty Co. with Strain Brothers during the 1950's, the parcels were deeded to Russell and Arthur as trustees for their families. No transfer of these properties to Strain Brothers was ever recorded, and the property tax assessments were made in the names of Russell and Arthur. However, for many years prior to 1963, the losses from the operations of the ranch were recorded in the books of Strain Brothers and deducted in its income tax returns. In computing these losses, depreciation on the ranch improvements and equipment and ad valorem taxes on the property were claimed as deductions. The ranch and equipment were reflected as assets of Strain Brothers on the company's balance sheets. The ranch had a fair market value of $44,500, the farm equipment a value of $1,650 and the inventory and receivables a value of $1,379.67 in September of 1963.

In October of 1963, by three separate deeds covering the entire Strain Ranch, one executed by Strain Brothers, another by Russell, individually and as trustee, and his wife, and the third by Harriet, the Strain Ranch was conveyed to the William Russell Strain Foundation and the Arthur W. Strain Foundation as tenants in common.

After June 17, 1963, the stock of Strain Brothers was owned by G & E Trust CR–7007 (186 shares of common stock) and the Strain trusts in the following proportions:

| Trust | Common stock | Preferred stock |
|-------|--------------|-----------------|
| William Russell Strain Trust CR–1 | 299 | ........ |
| William Russell Strain Trust CR–2 | 853 | 570 |
| Arthur W. Strain Trust CR–1 | 299 | ........ |
| Arthur W. Strain Trust CR–2 | 757 | 530 |
| Arthur Waldo Strain, Jr., Trust CR–1 | 2 | 393 |
| Mary Jean S. Murphy Trust CR–1 | | 450 |
| Katherine S. Hurd Trust CR–1 | | 254 |
| Kathleen Strain Hurd Oral Trust | | 342 |
| Richard Hurd Oral Trust | | 343 |

Respondent determined that the transfer of the ranch resulted in constructive dividends from Strain Brothers to Russell and Arthur

(or Harriet), each receiving a dividend equal to one-half of the total amount of the fair market values of the ranch property, the farm equipment, inventory, and accounts receivable. The parties have agreed, however, that the value of the farm equipment attributable to Russell and Arthur (or Harriet) is $800 and $850, respectively.

## Issue 11. Losses Incurred by Partnerships Farrwest and Graygold

Edgar Trust CR-1, created on December 1, 1961, was administered by its trustee, Wood. All the net income of the trust was to be paid to Edgar annually. In March of 1962, Wood, acting solely on his own initiative as trustee, invested $20,200 in a limited partnership, Farrwest Land Co. (hereafter Farrwest). The trust appears in the articles of partnership as a limited partner under the name of "Aceco." This partnership incurred net operating losses during 1962, 1963, and 1964. In his individual income tax returns for those years, Edgar deducted the losses of Farrwest to the extent allocated to Aceco.

Wood was also the trustee of Edgar Trust CR-2, created December 1, 1961. The income of this trust also was to be paid to Edgar annually. On March 1, 1962, Wood invested $25,100 of the trust assets in a limited partnership, Graygold. The trust appears in the articles of partnership as a limited partner under the name of "Smokedrake." This partnership incurred net operating losses during 1962, 1963, and 1964, and Edgar deducted in his individual income tax return the losses of Graygold to the extent allocated to Smokedrake.

Respondent determined that Edgar was not entitled to deduct the partnership losses claimed in his returns because he had "not established that * * * [he is] a partner of these partnerships" or is "otherwise entitled to deduct such an amount in the computation of taxable income."

## Issue 12. Penalties—Trusts' Failures to File Returns

The Strain trusts each received gross income in excess of $600 during 1964 and were required to file returns by April 15, 1965. Their returns were not in fact filed until March 14, 1966.

Each of the declarations of trust provided that the "entire annual net income" of the trust was to be distributed to the life income beneficiaries, and "Such payments shall be made monthly, or as the Trustees shall determine, but not less often than annually." They further provided that: "All capital gains and losses of the Trust, extraordinary stock dividends and capital gain dividends of investment companies shall be considered principal."

BYU was the charitable remainderman of these trusts. Respondent determined that since the income tax returns were not filed within the time prescribed by law, and the trusts did not show that the failure

to file was due to reasonable cause, the section 6651(a) penalty was applicable.

Edgar Trusts CR-2002, CR-3003, and CR-7007 also each received more than $600 in gross income during 1964 and failed to file returns by April 15, 1965. The return for Edgar Trust CR-7007 was filed on March 14, 1966, and the returns for Edgar Trusts CR-2002 and CR-3003 were filed on June 10, 1966.

All three of these trusts provided that the "entire annual net income" of the trusts was to be distributed to the life income beneficiary "monthly or as the Trustees shall determine, but not less often than annually." They further provided that "All capital gains and losses of the Trust * * * shall be considered principal." The remainderman of each of these trusts was a charitable organization during 1964.

Respondent determined that the failure to file returns within the time prescribed by law was not due to reasonable cause and asserted the penalty provided by section 6651(a).

## Issue 13. Penalties—Edgar's Negligent or Intentional Disregard of Rules and Regulations

Although Edgar filed a timely personal income tax return for 1964, he substantially understated his gross income for that year. Respondent determined that the resulting underpayment of tax was "due to negligence or intentional disregard of rules and regulations" and that the "5 per centum addition to the tax provided by Section 6653(a)" is applicable.

### OPINION

## Issue 1. Sale of the Strain Corporations

The Strains [9] reported their 1964 annual receipts from the Strain trusts as ordinary income, but they did not report any capital gain on the sale of the Strain corporations' stock to BYU. Respondent has determined that, in substance, each of the Strains sold or exchanged his shares of stock in the Strain corporations for an "annuity" and thereby realized capital gains, measured by the difference between the Strains' respective bases for their shares and the fair market values of their annuities. [10] Alternatively, respondent has determined that the Strain trusts realized capital gains on the sales.

Respondent's determination that the Strains individually realized gain on the sale to BYU depends, first, upon whether the transfers of stock to the Strain trusts may be ignored, and the transaction viewed

---

[9] The "Strains" include: Russell Strain, Harriet Strain, Arthur W. Strain, Jr., Katherine S. Hurd, and Mary Jean S. Murphy.

[10] Petitioner Harriet Strain transferred no stock to the trust created for her, and this argument does not, therefore, apply to her.

as if petitioners themselves had made the sales to BYU. This argument presents a variation of the familiar problem of substance versus form.

The basic principle to be applied in resolving the issue is that "A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title." *Commissioner* v. *Court Holding Co.*, 324 U.S. 331, 334 (1945); *Arnold Malkan*, 54 T.C. 1305, 1312 (1970). "A given result at the end of a straight path is not made a different result because reached by following a devious path." *Minnesota Tea Co.* v. *Helvering*, 302 U.S. 609, 613 (1938).

Yet a recitation of these truisms may not be substituted for a reasoned analysis of the crucial facts. The examination may not be limited to selected evidence which, when considered alone and in isolation, may suggest a particular conclusion. "Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant." *Commissioner* v. *Court Holding Co.*, *supra* at 334. The task is to evaluate the economic realities, and to see whether the various steps in the whole transaction are so critically interrelated that one is dependent upon the other. See *American Bantam Car Co.*, 11 T.C. 397, 406 (1948), affirmed per curiam 177 F.2d 513 (C.A. 3, 1949), certiorari denied 339 U.S. 920 (1950); *Sheppard* v. *United States*, 361 F.2d 972, 980 (Ct.Cl. 1966).

Turning to the evidence, we find that the Strains have shown good reasons for creating the trusts. In the early 1960's, Russell and Arthur, patriarchs of the Strain family, were getting old and facing serious health problems. Starting their careers with a small business initiated by their father in 1889, they had accumulated substantial wealth for themselves and members of their families, consisting mainly of stock in the three Strain corporations. The ownership of the stock had become spread among several members of their families, however, and tensions had developed between the owners. None of the younger members had either the interest or the ability to take over the management of the corporations and unify the family. Moreover, Russell and Arthur were concerned about the costs of the administration of their estates and the further dispersal of the stock ownership at their deaths.

Russell and Arthur retained Edgar, a lawyer and economic analyst, and Wood, a certified public accountant, to develop a plan for dealing with these problems. In the fall of 1962, they recommended a plan which culminated in the creation of the Strain trusts. Under the instruments establishing these trusts, control of all the stock of the Strain corporations was vested in Russell and Arthur or

their survivor, and they could name the successor trustees. In this manner, control of the stock was unified, and the management problems created by the family rifts were ameliorated. Establishment of the trusts assured the family members the income from their stock in the corporations for their respective lives, and eliminated the probate cost problems. Indeed, Arthur died in September 1963, and his estate was not formally administered.

As of June 17, 1963, two things are clear. First, the seven Strain trusts had been validly created. Trust instruments, effective on their face, had been executed; the Strains' stock certificates had been endorsed and canceled; and new stock certificates had been issued to the trusts. Second, no negotiations whatever for the sale of the stock had been conducted. Arthur had not favored a sale, hoping that his son would eventually become interested in managing the corporations. Although Edgar and Wood were given authority to explore sales possibilities at this time, they had not previously discussed the matter with BYU or anyone else. For about 2 months thereafter, they conducted some negotiations with Zion Securities Corp.; this was before they first talked with BYU in late August of 1963. The sale to BYU was not consummated until January of 1964.

We think the Strains have shown that the trust cannot be ignored and that the trusts made the sale to BYU. As grantors, the Strains irrevocably relinquished ownership of the stock and vested it in the trustees, subject to the rights of the life beneficiaries and the charitable remaindermen. The trusts were not mere "conduit[s]" of title, *Commissioner* v. *Court Holding Co.*, supra at 334; they were viable entities. *United States Trust Co.* v. *Commissioner*, 296 U.S. 481 (1936). Nor do we think the creation of the trusts was critically interrelated to the sale to BYU; indeed, the trusts were set up for reasons not connected with the sales or the disposition of the proceeds thereof. *American Bantam Car Co.*, supra at 406; *Sheppard* v. *United States*, supra at 980. Since no negotiations had been conducted between the Strains and BYU, when the trusts were established, obviously "no mutual understanding or meeting of the minds or contract existed between the parties." *Martin* v. *Machiz*, 251 F.Supp. 381, 390 (D.Md. 1966). The transfers in trust would have been legally binding on all the parties if a sale of the stock had never been arranged. And it cannot be said that the period of about 7 months during which the trusts owned the stock was one of "fleeting duration." *Salvatore* v. *Commissioner*, 434 F.2d 600, 602 (C.A. 2, 1970), affirming a Memorandum Opinion of this Court. The trusts made the sales. See *United States* v. *Cumberland Pub. Serv. Co.*, 338 U.S. 451 (1950); *Humacid Co.*, 42 T.C. 894, 913 (1964).

Anticipating that we might find that the trusts were owners of the stock at the time of the sale, respondent argues, alternatively, that the trusts sold or exchanged the stock in consideration of "annuities" for the life beneficiaries. Contending that the annuities thus acquired for the beneficiaries were comprised of both the principal and income of the trusts, respondent urges that capital gain was realized on the sale and that sections 671 [11] and 677 [12] require such capital gain to be taxed to the Strains. We do not agree.

A brief review of the documents will aid the analysis. Under the trust instruments, the net income was to be paid quarterly to the life beneficiaries, and on the termination of each trust the remainder was to go to one of two contemporaneously created foundations. In January of 1964, the trusts sold the corpus, consisting solely of the Strain corporations' stock, to BYU in consideration of its agreement to pay each trust a specified sum on a date 75 years after the sale or, at BYU's option, on the death of the last life beneficiary of the particular trust. In general, BYU was to pay interest at the rate of 10 percent per annum on the unpaid purchase price.[13] Pursuant to powers reserved in the trusts, BYU was named as the trustee and, in lieu of the foundations, was designated remainderman of each of the trusts. Thus, when the purchase price is finally paid at the death of the life beneficiaries or at the end of 75 years, it will probably be returned to BYU as remainderman.

Section 671 taxes to the grantor of a trust those gains "attributable to that portion of the trust" of which the grantor is considered the owner. The Income Tax Regs., sec. 1.671-3(b), distinguish between the ownership of the income portion of the trust and the corpus portion thereof. Section 677 provides that a grantor shall be treated as the owner of any portion of a trust if the income of that portion (1) may be distributed to him, or (2) held or accumulated for future distribution to him. Under these provisions, the terms of the trust instruments

---

[11] SEC. 671. TRUST INCOME, DEDUCTIONS, AND CREDITS ATTRIBUTABLE TO GRANTORS AND OTHERS AS SUBSTANTIAL OWNERS.

Where it is specified in this subpart that the grantor or another person shall be treated as the owner of any portion of a trust, there shall then be included in computing the taxable income and credits of the grantor or the other person those items of income, deductions, and credits against tax of the trust which are attributable to that portion of the trust to the extent that such items would be taken into account under this chapter in computing taxable income or credits against the tax of an individual. * * *

[12] SEC. 677. INCOME FOR BENEFIT OF GRANTOR.

(a) GENERAL RULE.—The grantor shall be treated as the owner of any portion of a trust, whether or not he is treated as such owner under section 674, whose income without the approval or consent of any adverse party is, or, in the discretion of the grantor or a nonadverse party, or both, may be—

(1) distributed to the grantor;

[13] Russell's CR-2 trust was to receive interest at the rate of 7.75 percent until his death and thereafter at 3.42 percent, and Arthur's CR-2 trust was to receive interest at 3.78 percent. All other interest was computed at the rate of 10 percent.

are crucial in determining the portions of the trusts of which the Strains are to be treated as the owners. [14]

Each of the trust instruments in question contains separate provisions on capital gains and income, including the following stipulation on the former: "All capital gains and losses of the Trust, extraordinary stock dividends and capital gain dividends of investment companies shall be considered principal." Such instruments also provide that the "entire annual net income" shall be distributed to the life beneficiaries and that the corpus is irrevocably set aside for the charitable remaindermen. The corpus portion may be neither distributed nor accumulated for future distribution to the life beneficiaries. Thus, if the instruments are given their natural meaning, the Strains did not become owners of the corpus portion of the trust. In no way could they have caused any capital gains to be distributed to them. Therefore, even if capital gains were realized by the trusts on the sale to BYU, such gains are not taxable to the Strains. Secs. 1.671–3(b)(1), 1.677(a)–1(g), Income Tax Regs.

Respondent contends, however, that, in substance, the only payments BYU as purchaser was to make were "annuity" payments, which were "interest" only in form, and that the obligations to pay the principal sums were "illusory" in that such sums will not be payable until after the death of the life beneficiaries. On the death of the last life beneficiary of each trust, BYU will succeed to its interests as remainderman of such trust, and the payment of the principal sum, if made at all, will be payable to BYU itself. Consequently, respondent contends, BYU, the new remainderman and a party to the sale, agreed to make annual payments equal to the full value of the property; thus, the argument goes, the "annuity" payments represent both the principal and interest portions of the trusts, and the capital gain realized on the sale is taxable to petitioners.

The question, then, is whether, as a result of the transaction with BYU, the corpora of the trusts were converted to annuities so that the annual payments to the trusts constituted both income and corpus.

The BYU sales agreements are not cast in the terms of annuity contracts, but rather provide for deferred payments of a stated purchase price with interest thereon. The agreements contain warranties that the trusts had free, clear, and absolute title to the Strain corporations' stock, that the balance sheets attached thereto were correct, and the like, together with provisions for settling by arbitration any disputes arising from breaches of such warranties. All the expert witnesses agree that these provisions are foreign to annuity contracts. Moreover, BYU was not engaged in the business of writing annuity

---

[14] Again, since Harriet Strain was not the grantor of any of the trusts, this argument does not apply to her alleged liability.

contracts; indeed, it had previously issued only one such contract. [15] In addition, the parties testified that they did not intend these agreements to constitute annuities. These factors alone may not be fatal to respondent's case; however, it has been pointed out that where noncommercial annuity contracts are involved, "the instruments evidencing the agreement ought to spell out in detail the intent of the parties that there is contemplated an annuity venture." Galvin, "Income Tax Consequences of Agreements Involving Noncommercial Annuities," 29 Tex. L.Rev. 469, 508 (1951); *Samuel* v. *Commissioner*, 306 F.2d 682, 687 (C.A. 1, 1962), affirming 36 T.C. 641 (1961).

Notwithstanding respondent's emphasis on testimony that BYU's representatives consulted mortality tables during the sales negotiations, the amounts annually payable to the life beneficiaries were not computed with reference to their respective life expectancies. Cf. Income Tax Regs., sec. 1.72–2(b)(2)(ii). Instead, such amounts were determined as a percentage of the values of the stockholdings. In each case—for examples, the trust (Arthur Waldo Strain, Jr., Trust CR–1) with a single life beneficiary 38 years of age, and the trust (Arthur Strain Trust CR-1) with 8 beneficiaries, the youngest of whom was 4 years of age—approximately the same interest percentage and same price per share was used in computing the annual payments. [16] BYU's representatives consulted the mortality tables not to compute the amounts to be paid annually but, in evaluating the proposal, to ascertain the probable duration of the payments.

Nor does it appear that the interest payments will result in a distribution of part of the principal of the trusts to the life beneficiaries. Cf. Income Tax Regs., sec. 1.72–1(c)(1); see *J. Giltner Igleheart, Sr.*, 10 T.C. 766, 769–770 (1948), affd. 174 F.2d 605 (C.A. 7, 1949). Under the trust instruments as originally executed, the remainderman was

---

[15] As a general rule, private annuity agreements, contingent both on the annuitant's life span and the obligor's ability to make the payments, do not constitute amounts realized as income within the meaning of sec. 1001(b). See, e.g., *Commissioner* v. *Kann's Estate*, 174 F.2d 357 (C.A. 3, 1949), affirming a Memorandum Opinion of this Court; *J. Darsie Lloyd*, 33 B.T.A. 903 (1936); *Hill's Estate* v. *Maloney*, 58 F.Supp. 164 (D. N.J. 1944), Andro, "Non-Commercial Annuities—Income Tax Consequences to the Transferor Who Exchanges Property in Return for an Annuity," 9 Tax L.Rev. 85, 86–87 (1953); Maguire, "Sale of Capital Assets for Other than 'Lump Sum' Consideration," 8th Ann. N.Y.U. Tax Inst. 759, 763 (1950). In Rev. Rul. 62–136, 1962–2 C.B. 12, respondent sought to equate a charitable organization which "from time to time, issues annuity contracts" with a commercial annuity company. As noted, however, BYU had previously issued only one annuity contract, and in *Dix* v. *Commissioner*, 392 F.2d 313, 316 (C.A. 4, 1968), affirming 46 T.C. 796 (1966), the court adopted the Commissioner's argument that this "from time to time" language "was intended to embrace only those organizations which write enough annuity contracts to obtain a good spread of the actuarial risk."

[16] The several agreements reflect some variations in the sales prices used for the stock, as well as the interest rates. While the testimony is not entirely satisfactory on the point, these variations were "negotiated," evidently to divide among the various trusts the agreed total sales price and annual interest payments. In any event, the expert witnesses of both parties agree that these variations provide no support for respondent's annuity theory.

to receive the Strain corporations' stock, and the life beneficiaries were to receive the income therefrom. As a result of the sale to BYU, the remainderman will be entitled to receive the equivalent of the stock (i.e., the sales price or the January 1964 fair market value), and the life beneficiaries will annually receive the interest payments.

The factual situation is complicated by BYU's status as both the purchaser and the remainderman. In these circumstances, BYU theoretically might have been willing to pay an amount of interest greater than the income produced by the properties, and payment of such an amount in excess of the income would have resulted in a partial distribution of the corpus to the life beneficiaries. However, the evidence indicates that such a distribution was not anticipated or intended and that the interest payments were less than the annual income produced by the corporations. The Strains have shown that, at the time the trusts were created, the Strain corporations' income was about $122,-000 per annum (before deducting depreciation), whereas the annual interest payments approximated only $106,000 each year.

Respondent does not challenge these income figures or attempt to project a future decline in income, but relies upon annuity tables, which assume a 4-percent interest factor, to show that the annual "interest" payments include part of the corpus. We think this approach is fallacious in that it works backward. Without looking at either the fair market value of the properties sold or the income being produced by such properties, it assumes that the agreements created annuity arrangements and then computes the value of the annuities by applying the annuity tables to the amounts of the annual payments.[17] We do not think the facts can be so easily ignored.

---

[17] The following table demonstrates the harshness of the results produced by use of the annuity tables; it sets forth the trusts making the sales, the price and total value of the stock sold on Jan. 3, 1964, and the amount of the gain as computed by respondent through use of annuity tables:

| Trust | Price of stock | Gain computed by respondent |
|-------|----------------|-----------------------------|
| William Russell Strain Trust CR-1 | $120,189.03 | $359,881.92 |
| William Russell Strain Trust CR-2 | 379,785.48 | 349,068.82 |
| Katherine S. Hurd Trust CR-1 | 110,713.29 | 235,885.75 |
| Arthur W. Strain Trust CR-1 | 120,189.03 | 382,886.10 |
| Arthur W. Strain Trust CR-2 | 343,415.34 | 161,913.26 |
| Arthur Waldo Strain, Jr., Trust CR-1 | 84,308.55 | 181,716.66 |
| Mary Jean S. Murphy Trust CR-1 | 89,061.88 | 207,095.63 |
| Edgar Trust CR-7007 | 75,000.00 | 181,005.00 |
| Total | [1] 1,322,662.60 | 2,059,453.14 |

[1] This total amount of the price (value) of the stock does not include the $71,925 allocable to the oral trusts for Richard Hurd and Kathleen S. Hurd.

We hold that the form of these transactions expressed their substance. BYU did not issue annuities either to petitioners or the trusts, but rather acquired the Strain corporations' stock through deferred payment contracts.

Nor do we think the trusts realized capital gain in 1964, when the sale to BYU was consummated. Where deferred payments are evidenced only by a contract, and no notes, bonds, or other evidence of indebtedness other than the contract itself are given, the amounts of the deferred payments are includable in the income of a cash basis taxpayer only when payment is received. The rule was recently restated in *Western Oaks Building Corp.*, 49 T.C. 365, 376–377, (1968), with numerous supporting citations, as follows:

In determining the income derived from the sale of property by a cash method taxpayer, a right to receive future income is not included in the computation of the "amount realized" under section 1001(b) unless that right is the equivalent of cash. * * * This is true even though for other purposes that right may be considered to have a fair market value. * * *

In determining whether the right to receive income in the future is equivalent to cash, the test is whether the debtor's promise to pay is embodied in "notes, mortgages, or other evidence of indebtedness such as commonly change hands in commerce." * * * The obligations must, "like money, be freely and easily negotiable so that it readily passes from hand to hand in commerce." * * *

Notwithstanding the guarantee by the Corporation of the President of the Church of Jesus Christ of Latter-Day Saints of BYU's obligations under the sales agreement, we think it quite clear that they were not the equivalent of cash in the hands of either petitioners or the trusts in 1964. Accordingly, no capital gains are recognized in that year on the sale to BYU.

*Issue 2. Assumption of Liabilities on Loans From Strain Brothers*

In computing the tax liabilities arising from the January 3, 1964, transaction with BYU, respondent determined that Russell and Harriet (and, alternatively, the William Russell Strain Trust CR–1 and the Arthur W. Strain Trust CR–1) realized taxable income in the amounts of $24,000 and $41,000, respectively, when BYU assumed their liabilities on the June 10, 1963, notes in these amounts. Petitioners contest this determination.

As detailed in our Findings, on June 10, 1963, Russell and Arthur withdrew $24,000 and $41,000, respectively, from Strain Brothers and gave it their notes in these amounts, payable, without interest, 75 years later. These notes were secured by liens endorsed on the stock certificates which Russell and Arthur transferred to their CR–1 trusts as of June 17, 1963. Respondent did not determine, and does not here

contend, that these withdrawals were taxable in 1963 or that the forms created by the parties did not reflect the substance of their transactions. Nor do any of the petitioners make such contentions in this proceeding. We, therefore, assume the validity of the forms created by the parties. Cf. *Higgins* v. *Smith*, 308 U.S. 473, 477 (1940).

On January 3, 1964, the CR-1 trusts created by Russell and Arthur sold their stock in Strain Brothers to BYU. The sale agreements provided that the liens on the stock securing the notes were not covered by the warranties that the trusts had free and clear title to the stock, and gave BYU the option to reduce its principal payments by amounts equal to the amounts of the notes. That Russell and Arthur did not anticipate paying the notes is indicated by their extended term, 75 years, which greatly exceeded the life expectancy of either of them. Clearly, it was anticipated that the loans would be repaid only out of the security, and BYU acquired the stock subject to that understanding.

Respondent included the amounts of the notes in its computations of the gains realized by the trusts. In this connection, section 1001(a) provides that the gain from the sale of property "shall be the excess of the amount realized therefrom over the adjusted basis." Section 1001 (b) provides that the "amount realized" shall be "the sum of any money received plus the fair market value of the property (other than money) received." Under the principle of the landmark case, *Crane* v. *Commissioner*, 331 U.S. 1 (1947), where a buyer takes property subject to a lien or assumes a liability of the seller, the "property" received by the seller includes the amount of the liability. *Teitelbaum* v. *Commissioner*, 346 F.2d 266, 269 (C.A. 7, 1965), affirming a Memorandum Opinion of this Court; *Smith* v. *Commissioner*, 324 F.2d 725 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court; *Floyd R. Clodfelter*, 48 T.C. 694, 701 (1967), affd. 426 F.2d 1391 (C.A. 9, 1970); *Woodsam Associates, Inc.*, 16 T.C. 649 (1951), affd. 198 F.2d 357 (C.A. 2, 1952); *Mendham Corporation*, 9 T.C. 320 (1947). Therefore, the amount realized by the trusts included the amounts of the liens securing the notes given by Russell and Arthur.

Although, as discussed above, the deferred cash payments called for by the sales agreements will not be taxable to the trusts until they are received, the gain attributable to the liens was realized in 1964. The gain so realized is the difference between the amounts of the liens and the trusts' substituted bases for the stock, stipulated to be $7,053.41 and $7,122.18 for Russell's and Arthur's CR-1 trusts, respectively.[18]

---

[18] Since the sale added nothing to the net value of the corpus, dedicated to charity in 1963, none of the gains realized thereon were paid or permanently set aside by the trusts during 1964 for charitable purposes. Consequently, the trusts were not entitled to offsetting deductions under sec. 642(c).

*Issue 3. Compensation of Edgar by the Strains—G & E Trust CR-7007*

Edgar was paid $10,000 by checks for his services in designing and establishing the Strain family trusts, but this payment did not compensate him for his services in promoting the sale of the stock of the Strain corporations. For these latter services, we think he was compensated through an arrangement whereby the Strains permitted a trust, G & E Trust CR-7007, to purchase 186 shares of Strain corporation stock at a bargain price.

As detailed in our Findings, on June 10, 1963, Edgar created the G & E Trust CR-7007, transferring thereto $110 in cash and naming himself and his wife life beneficiaries and a hospital as charitable remainderman. On the same day, Russell and Arthur agreed to sell 186 shares of Strain Brothers stock to the trust for $100, subject to options in the Strains' favor to repurchase the stock at the same price within 18 months unless, in the meantime, it was sold along with the stock of all the Strain corporations. Quite obviously, the stock had a substantially greater value than $100; indeed, when all the Strain corporations' stock was sold about 7 months later, on January 3, 1964, the purchase price attributed to these shares was $75,000. It seems clear that the Strains would not have sold these valuable shares to anyone else for $100; they had some reason for so dealing with Edgar. See *William H. Husted*, 47 T.C. 664 (1967), acq. 1968-1 C.B. 2. Since Edgar agreed to, and thereafter did, devote a substantial amount of his time to arranging the sale of all the stock, we think the only reasonable inference is that this bargain purchase was designed and intended as compensation for Edgar's services.

Amplifying the broad definition of gross income in section 61, the regulations provide that if property is transferred for an amount less than its fair market value, to an employee or independent contractor as compensation, "then regardless of whether the transfer is in the form of a sale or exchange, the difference between the amount paid for the property and the amount of its fair market value at the time of the transfer is compensation and shall be included in the gross income of the employee or independent contractor." Sec. 1.61-2(d)(2)(i), Income Tax Regs. See *Commissioner* v. *LoBue*, 351 U.S. 243 (1956); *William H. Husted, supra; Geo. S. Carter*, 36 T.C. 128 (1961). The present transaction falls squarely within this regulation.

Edgar contends that the only income he realized on this transaction in 1964 consisted of interest payments on the sale price for these shares, received by the trust and distributed to him. He contends that he never personally owned the 186 shares of stock, that this stock was acquired by the trust, and that the trust proceeded as a joint venturer with the Strain trusts in arranging and making the sale to BYU. All of his services, he argues, were performed in his capacity as trustee.

Even if full legal effect is given to the precise forms which Edgar says he created, he nevertheless realized taxable income in an amount equal to the fair market value of the stock less his outlay of $100. If we are to assume that a joint venture was created, the CR–7007 trust did not acquire its interest in the capital thereof worth thousands of dollars for only $100; such interest was acquired as consideration for the performance of services by Edgar, in connection with the sale of the Strain corporations' stock. Section 1.721–1(b)(1), Income Tax Regs., provides that the value of a capital interest in a partnership (which includes a joint venture, sec. 7701(a)(2)) "transferred to a partner as compensation for services constitutes income to the partner under section 61. The amount of such income is the fair market value of the interest in capital so transferred." Thus, even if we indulge in the further assumption that the services were performed by Edgar as trustee rather than as an individual, the value of the stock would represent part of the trust's ordinary net income. The trust instrument specifically provides that the "entire annual net income" is distributable to Edgar; he would be taxable, therefore, as grantor on the trust's bargain purchase income under section 671, even though no distribution was actually made.

But we think it unrealistic to indulge in these assumptions. In June 1963, Edgar agreed with the Strain brothers to attempt to locate a buyer for the Strain corporations' stock, and for these future services Russell and Arthur agreed to sell the 186 shares at a bargain price of $100, subject to the option to repurchase. Edgar then created the CR–7007 trust, of which he was life beneficiary, and arranged for it to receive the stock. Edgar performed the agreed services and earned income represented by the value of the stock. By having the trust purchase the stock at the agreed bargain price, he merely assigned his income to it. The refinements of legal title cannot be so employed as a means of escaping tax. E.g., *Lucas* v. *Earl*, 281 U.S. 111 (1930).

The amount and timing of the taxable compensation received by Edgar depend upon the value of the property at the date of the lapse of the option. Section 1.61–2(d)(5), Income Tax Regs., provides that when "any property * * * is transferred by an employer to an employee or independent contractor as compensation for services and * * * is subject to a restriction which has a significant effect on its value, the rules of paragraph (d)(2) of § 1.421–6 shall be applied in determining the time and the amount of compensation to be included in the gross income of the employee or independent contractor." Since the stock received by the CR–7007 trust was subject to the option of Russell and Arthur to repurchase it within 18 months for what the trust had originally paid and the option expired with the sale to BYU in January of 1964, the amount of compensation is, as provided in regulations section 1.421–6(d)(2)(i):

the lesser of—

(a) The difference between the amount paid for the property and the fair market value of the property (determined without regard to the restriction) at the time of its acquisition, or

(b) The difference between the amount paid for the property and either its fair market value at the time the restriction lapses or the consideration received upon the sale or exchange, whichever is applicable.

In view of the uncontradicted testimony of petitioners' expert witness, we have found that the fair market value of the 186 shares, a minority interest in a closely held corporation, as of June 10, 1963, was $56,250. This valuation reflects a 25-percent discount of the January 1964 sales price, attributable primarily to the minority interest factor. Consequently, the amount of the compensation was $56,250 less the $100 paid for the stock, or $56,150. This amount is includable in Edgar's income for 1964, when the restriction lapsed. Income Tax Regs. sec. 1.421–6 (d) (2) (i) ; cf. *Deutsch* v. *Commissioner*, 405 F.2d 889 (C.A. 9, 1969), affirming per curiam a Memorandum Opinion of this Court.

As in the case of the Strain trusts, respondent computed Edgar's 1964 income from this transaction by treating the annual payments received by the trust as annuity payments. Applying the 4-percent annuity tables, respondent computed the value of the annuity and, consequently, the amount of compensation for Edgar's services at $180,905. For the reasons given in our discussion of the Strain trusts (issue 1), this approach is erroneous. We hold that Edgar received $56,150 as compensation for his services in selling the Strain corporations' stock, and, consistent with our conclusions as to the Strains, that he correctly reported the distributions by the trust in 1964 as ordinary income.

However, the remainder interest in G & E Trust CR–7007 was irrevocably dedicated to charitable purposes within the meaning of section 170(a). Consequently, subject to the percentage limitations prescribed in section 170(b), Edgar is entitled to a charitable contribution deduction for the value of the remainder interest in the stock (worth $56,250) he transferred. Any gain realized by the trust on the sale of the stock was permanently set aside for charitable purposes within the meaning of section 642(c) and is, therefore, deductible by the trust.

*Issue 4. Sale of Duplex and Loan of Money—Edgar Trust CR–2002 and CR–3003*

The transactions involving these two trusts, created by Edgar in 1963, present factual patterns similar to those involving the Strain

trusts. On January 2 of that year, Edgar created Edgar Trust CR–2002, naming himself and his wife successive life beneficiaries, and on the same date he conveyed to it a duplex residence with a value of $34,500. On January 2, 1964, the trust sold the residence to BYU, which had been designated as charitable remainderman, for $34,500 payable December 31, 2010, with annual interest thereon at the rate of 8 percent. The terms of the trust instrument and sales contract were similar in principle to those involved in the Strain trusts' transactions. Respondent, employing the 4-percent annuity tables in making his computations, determined that Edgar realized income in 1964, when he "exchanged a duplex with an adjusted basis of $29,623.71 to Brigham Young University for an annuity with a present value of $66,609.84 resulting in a capital gain of $36,986.13."

On September 17, 1963, Edgar, as settlor, created Edgar Trust CR–3003, and transferred to it some stock having a fair market value of $17,325.82 which he had acquired in exchange for an agreement to pay his father an annuity.[19] On November 16, 1963, BYU was named remainderman and, thereafter, in 1964 the trust loaned BYU $17,500 on a note payable June 1, 2010, and bearing 7-percent interest annually until paid.

Respondent argues that Edgar "sold" the cash of $17,500 to BYU for an annuity worth $29,564.15, computed by reference to the 4-percent annuity tables, and thereby realized capital gain in 1964 in the amount of $12,064.15. Alternatively, respondent argues that the gain represented compensation for services rendered to BYU.

As with the Strain family trusts, we think respondent erred in recasting these arm's-length transactions into exchanges for annuities. The artificiality of respondent's position is demonstrated by a mere statement of his contention that the Edgar Trust CR–3003 "sold" cash for an annuity worth almost twice the amount of the cash and thereby realized gain. Further, we think that respondent erred in fabricating an employment relationship between Edgar and BYU. Prior to these transactions Edgar's only contact with BYU was in his capacity as the representative of the Strain family trusts. Respondent's entire argument on this point is predicated upon a memorandum from Lewis to the president of BYU, dated October 21, 1963, which, in part, says:

My impression is that [Edgar] could be an excellent prospect for helping to get funds through his estate planning, and that it might be possible to work out something with him under a percentage arrangement if we ever wanted to get down to cases.

---

[19] Although the parties disagree as to proper basis for this stock, we have found as a fact that Edgar's basis was $17,316.35. However, in view of our disposition of this issue, the amount of gain realized by the trusts is irrelevant.

However, Lewis testified that neither the purchase of the duplex nor the loan to BYU was intended to represent compensation to Edgar. We are unable to perceive any element of compensation in the transactions between those trusts and BYU.

As to any gain realized by the trusts on the sale of the duplex and the stock, the amounts thereof were permanently set aside for the charitable remainderman so that the trusts were entitled to offsetting charitable deductions under section 642(c). Consequently there are no deficiencies in the income taxes of the two trusts.

*Issue 5. Deductions for Charitable Remainders—Russell and Arthur Strain Trusts*

In their income tax returns for 1963, Russell and Harriet (in the joint return for herself and Arthur) claimed charitable contribution deductions for the actuarially computed values of the remainder interests under their trusts, Russell's CR-1 and CR-2, Arthur's CR-1 and CR-2. Respondent disallowed the deductions. On brief he argues that, since the foundations are not shown to have been tax-exempt organizations, no deduction is allowable for the remainder interests. We do not agree. [20]

On the death of the survivors of the life beneficiaries of each of the trusts, the remainders were to be distributed to foundations which Russell and Arthur, respectively, had created. The trust instruments, however, provided:

Should said Foundation be not then a tax exempt organization under the Federal Tax laws then in effect, such corpus shall be distributed to such Federal tax exempt hospital, church or school as a court of proper jurisdiction shall determine.

Section 170(a) allows as a deduction "any charitable contribution * * * payment of which is made within the taxable year." In the case of a transfer in trust, section 1.170-1(d)(1), Income Tax Regs., specifically allows a deduction "for a contribution of * * * an interest in the remainder." [21] Such an interest is to be valued in the manner set forth in section 1.170-2(d)(2), Income Tax Regs. The fact that a life estate devoted to private purposes intervenes does not preclude deductibility. *Alice Tully*, 48 T.C. 235 (1967).

A charitable contribution, however, is defined as a gift to or for the use of a "corporation, trust, * * * or foundation * * * organized and operated exclusively" for charitable purposes. Sec. 170(c)

---

[20] In the foregoing discussion of issue 1, we have rejected respondent's contentions that the trusts should be disregarded and that the remainder interests were "illusory." For the reasons given, we think these contentions lack merit as grounds for denying charitable contribution deductions for the remainder interests.

[21] The provisions of sec. 170(f) as amplified by sec. 1.170-1(d)(2), Income Tax Regs., lay down special rules for transfers of future interests in tangible personal property after Dec. 31, 1963, but the transfers of personal property here in dispute were made before that date.

(2) (B). We find no merit in respondent's contention that the claimed charitable contributions must be denied on the ground that the Strain Foundations do not comply with this definition. Deductions are allowed for contributions "to or for the use of" the organizations enumerated in section 170(c) (2) even though the particular recipient has not been designated. *Alice Tully, supra* at 244–245; *William D. O'Brien,* 46 T.C. 583, 593 (1966). It is the irrevocable dedication of property for charitable purposes rather than the dedication to a particular beneficiary for which the statute allows a deduction. Cf. *Winthrop* v. *Meisels,* 281 F.2d 694 (C.A. 2, 1960).

In this case, only a tax-exempt organization can benefit from the transferred property. As the instruments stood in 1963, if the foundations were not tax exempt when the trust terminated, the corpus thereof could not be distributed to them. The distribution would be made to some other tax-exempt organization. Whether the foundations were tax exempt in 1963 is not controlling. The point is that, in that year, the remainder interests in the trusts were irrevocably dedicated to charitable purposes; therefore, Russell and Harriet are entitled to deductions for the values of those interests under section 170(a). [22]

*Issue 6. Deductions for Charitable Remainders—Edgar Trusts*

During the years 1962, 1963, and 1964, Edgar made various transfers to charitable remainder trusts and claimed charitable contribution deductions for the values of the remainder interests. Respondent disallowed all of the claimed deductions on the general ground that Edgar did not establish that he was entitled to them. On brief, however, he has asserted more specific reasons for supporting his determinations.

In respect of 1962, respondent urges that the corpus of Edgar Trust CR–1 was invested in a limited partnership, "a land development company which easily might fail," with the result that the amount of the remainder interest that would ultimately pass to the charity was "unassured and unascertainable." On this ground, he asks us to sustain the disallowance of the deduction of the remainder interest in the vacant lot transferred to this trust in that year.

---

[22] Sec. 170(b)(1)(B) limits the amount of the deduction to 20 percent of the taxpayer's adjusted gross income, except that an additional 10 percent is allowed if the contribution is made to charities designated by sec. 170(b)(1)(A). An irrevocable dedication of property to a class consisting of tax-exempt hospitals, churches, or schools would qualify for the additional 10 percent under this latter provision. *Alice Tully,* 48 T.C. 235 (1967). However, under the terms of the trust instruments as they stood at the time of the dedication to charitable purposes (i.e., at the time of the contribution) in June of 1963, the remainder interests might have gone to the foundations; at that time the foundations might have been tax exempt even though they were not sec. 170(b)(1)(A) organizations. Accordingly, the allowable deduction may not exceed 20 percent of the adjusted gross income of Russell and Harriet for 1963.

We think respondent's argument lacks merit. The gift to the charity was not "dependent upon the performance of some act or the happen-ing of a precedent event in order that it might become effective." See sec. 1.170–1(e), Income Tax Regs. The charity's interest vested immediately upon the transfer in trust. There is no evidence to suggest that the partnership venture involved any extraordinary risk; participation in any business endeavor or investment involves some risks. Trustees are charged with a duty to preserve the trust corpus for the benefit of the charitable remainderman, as well as the life beneficiaries; and, in the absence of evidence that they have violated their trust, it will not be presumed that they will do so. *William D. O'Brien, supra* at 595. Absolute certainty that the charity will eventually receive the contribution is not required as a condition to the allowance of the deduction. See *James L. Darling*, 43 T.C. 520 (1965). We conclude that Edgar is entitled to a deduction for the charitable remainder of Edgar Trust CR–1.

Respondent contends that the value of the charitable remainder of Edgar Trust CR–1001 is not deductible because the residence transferred thereto during 1962 was depreciable property, and no provision was made for a reserve for depreciation. We do not agree.

In most States, the failure to create a reserve for depreciation does not involve an encroachment on the corpus of a trust. Even in those States which have adopted section 13(a)(2) of the Revised Uniform Principal and Income Act, which generally requires the establishment of a reserve for depreciation, the use of trust property by the life beneficiary as a residence without a reserve for depreciation does not constitute such an encroachment. Bogert, Trusts and Trustees, sec. 829 (2d ed. 1962); 3 Scott, Trusts, sec. 239.4 (3d ed. 1967). Depreciation is treated as having a *de minimis* effect on the corpus. This treatment evolved because of the difficulty inherent in distinguishing between economic fluctuations in value, which may favorably or adversely affect the interest of the remainderman, and physical deterioration, which ordinarily results in some diminution in the value of the corpus.

These considerations caused the Board of Tax Appeals to disregard the element of depreciation in valuing remainder interests for purposes of Federal gift taxes in *J. C. Gutman*, 41 B.T.A. 816, 818–819 (1940), as follows:

we are here concerned, not merely with physical condition of a tangible property as affected by passage of time, but with the present worth of an intangible, that is the right to receive in the future a property of value not now subject to exact ascertainment. Without the power of prophecy no one can state the value of the property at some time in the future. * * * If omniscience enabled us to value property in the future, then depreciation for the same period might logically be deducted. Absent such omniscience, the element of depreciation must

obviously not enter into consideration. * * * The mortality tables, as in the case of intangibles, such as stocks to be received in the indefinite future, seem to furnish the only practical means of calculation, for we here deal equally with an intangible—the value of a property in the future. * * *

Similarly, in *National Bank of Commerce in Memphis* v. *United States*, 422 F. 2d 1074, 1077 (C.A. 6, 1970), the court allowed an estate tax deduction for a charitable remainder in depreciable real estate, stating:

In the real estate area, * * * the depreciation allowance is in a sense a legal fiction, because successive purchasers can depreciate the property over and over again, using as a basis their purchase price. * * * Future real estate values are, quite literally, a matter of speculation, and presumably the market value of realty improvements * * * takes into account likely physical depreciation.

We think the reasoning is equally applicable in computing the amount of a charitable contribution deduction for income tax purposes.[23]

We hold that Edgar is entitled to a charitable contribution deduction for the value of the remainder interest in the residence transferred to Edgar Trust CR–1001.

During 1963, Edgar made transfers to Edgar Trusts CR–2002 and CR–3003, which are similar in principle to the Strain trusts. Some of the reasons asserted by respondent for disallowing the charitable contribution deductions claimed by Edgar for these transfers (e.g., that the corpus is illusory), are the same as those considered and rejected in relation to the Strain trusts. Because of the similarity of the facts involved, we also reject those arguments here. See issue 5, above.

However, respondent urges that there are additional reasons why Edgar is not entitled to a charitable contribution deduction for 1963 for the value of the remainder interest in the duplex and stock brokerage account transferred to Edgar Trusts CR–2002 and CR–3003, respectively. He argues that "Congress never intended to allow as a charitable contribution deduction the value of a remainder interest in respect of property sold at a handsome profit during the next

---

[23] S. Rept. No. 91–552, to accompany H.R. 13270 (Pub. L. 91–172), 91st Cong., 1st Sess. (1969), states at p. 87–89 :

The requirement that a deduction is to be allowed only if the remainder interest given to charity is in the form of an annuity trust or unitrust could have a significant adverse effect on established forms of charitable giving, * * * such as a residence, where the donor reserves a life estate in the property. * * * The committee believes that it is possible to continue to allow a charitable deduction in these types of cases with appropriate limitations, however, to prevent the overstating of the charitable contribution deduction.

*      *      *      *      *      *      *

Another additional situation in which the committee amendments allow a charitable contribution deduction for the gift of a remainder interest to charity is in the case of a nontrust gift of a remainder interest in real property to charity. Thus, for example, a charitable contribution deduction is to be allowed where an individual makes a gift of his residence to charity and retains the right to live in the residence for his life. The committee does not believe that this type of situation generally presents the kind of abuse which both the House and the committee believe it appropriate to curtail.

succeeding year to the very same charitable remainderman." In his reply brief, he asserts that the deductions were properly disallowed because the sale of the property to the charitable remainderman "rendered impossible the receipt by BYU of the principal of either Trust."

We know of no law or rule of law which would deny a charitable deduction merely because the trust corpus was later sold, and respondent has not referred us to any such authority. Nor is there any merit in respondent's second point. The remainder of these trusts will eventually go to the charities, and therefore the sale of the duplex and the loan of the money did not render impossible the receipt of the corpora by the charities.

During 1964, Edgar contributed cash to the CR–3003 and CR–4004 trusts, and claimed the values of the remainder interests in that cash as a charitable contribution deduction. This deduction was also disallowed. In addition to the arguments which respondent raised in relation to the 1962 and 1963 deductions, respondent contends that no evidence was produced to show that the amount of the deduction was correctly computed. We also disagree with this contention.

The evidence shows that Edgar contributed $967.18 and $2,500 to his CR–3003 and CR–4004 trusts, respectively, during 1964. The parties have stipulated that the ages of the life beneficiaries were 45 and 44 and respondent's tables indicate that, for life beneficiaries of those ages, the value of the remainder interest is 32.207 percent of the value of the property transferred to the trust or $311.50 and $805.18, respectively. Sec. 20.2031–7, Estate Tax Regs. Edgar is entitled to deduct $1,116.68 of the $1,145.48 claimed on his return; he has conceded that, through oversight, he failed to substantiate the difference of $28.80.

*Issue 7. Contributions to Strain Foundations—Russell Strain and Harriet Strain*

During 1964, Russell and Harriet each contributed money to the private foundations which were created in 1963, and each claimed a deduction therefor as a charitable contribution. Respondent disallowed these deductions on the broad ground that neither Russell nor Harriet had established a right to the deduction and here contends that the organizations were not operated exclusively for charitable purposes.

Section 170(a)(1) allows a deduction for "any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year." Subsection (c) defines a charitable contribution as:

a contribution or gift to or for the use of—

\*        \*        \*        \*        \*        \*        \*

(2) A corporation, trust, or community chest, fund, or foundation—

\* \* \* \* \* \* \*

(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes \* \* \*

Petitioners do not contend that their contributions were made "for the use of"—i.e., in trust for [24] a charitable organization, but rather that they were made "to" such an organization. The burden is upon petitioners to show that the foundations to which they made the contributions were both organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes. *Isabel Peters*, 21 T.C. 55, 59 (1953); *John Danz*, 18 T.C. 454 (1962), affd. 231 F.2d 673 (C.A. 9, 1955), certiorari denied 352 U.S. 828 (1956). That, they have failed to do.

The William Russell Strain Foundation, controlled by Russell, his wife, and daughter, and the Arthur W. Strain Foundation, controlled by Arthur (until his death in September of 1963), his wife, and son, owned the Strain Ranch as tenants in common. The sole activities of the foundations consisted of the operation of the ranch. At no time during 1963 and 1964 or any other time has it been shown that the foundations performed any charitable activities or contributed any funds to support such activities. Located on the ranch were the summer homes of the Strain families, and each family paid rent to the respective foundations for the use of these homes. However, these rental payments were not sufficient to cover the cost of the operation and maintenance of the ranch so that additional amounts were paid by the Strain families to the foundations each year to cover the deficit. These additional sums were the amounts deducted as charitable contributions.

On the basis of this record, we are not convinced that, within the meaning of section 170(c)(2)(B), the foundations were "operated exclusively" for the specified purposes during 1964. The Strains continued to enjoy the ranch as they had before transferring it to the foundations, and we find nothing in the transfer to justify their deduction of a portion of the cost of maintaining that facility. We think the ranch was maintained and operated primarily to provide a recreational facility for the Strains; this was a "noncharitable purpose substantial in nature," and therefore the foundations were not "devoted to *Charitable* purposes *exclusively*." *Stevens Bros. Foundation, Inc.* v. *Commissioner*, 324 F.2d 633, 638 (C.A. 8, 1963), affirming on this point 39 T.C. 93 (1962), certiorari denied 376 U.S. 969 (1964); *Sonora Community Hospital*, 46 T.C. 519 (1966), affirmed per curiam 397 F.2d 814 (C.A. 9, 1968).

[24] *William D. O'Brien*, 46 T.C. 583, 593 (1966); *John Danz*, 18 T.C. 454, 464 (1952), affd. 231 F.2d 673 (C.A. 9, 1955), certiorari denied 352 U.S. 828 (1956).

## Issue 8. Salary Continuation Agreement

On September 6, 1963, when Arthur died, Strain Brothers began paying Harriet the $1,000 per month provided by the salary continuation agreement which had been executed for her benefit. The question is whether she may deduct as a charitable contribution the value of the agreement which she purported to transfer to BYU on January 2, 1964.

We agree with respondent that Harriet has not shown that she is entitled to the deduction. The evidence bearing on this issue is skimpy, but we think it clear that Harriet's relinquishment of her rights under the agreement was part and parcel of the whole transaction between BYU and the Strain trusts. Under the sales agreements, BYU obligated itself to pay $106,000 per year out of income of only about $122,000. The salary continuation payments would have consumed a large part of the margin. BYU intended to, and did, liquidate the corporations, so that it would have become the principal obligor on the salary continuation agreement. We think it unlikely that BYU would have wanted to assume the additional $12,000 payment.

Harriet's emphasis on her lack of ownership of any of the stock of the Strain corporations in support of her argument that she was not a party to the January 2, 1964, sale misses the point. By reason of Arthur's death, she had succeeded to her rights as beneficiary of Arthur's CR-1 and CR-2 trusts, and under the sales agreements she became entitled to interest payments totaling $25,000 per annum. On consideration of all the evidence, we infer that she relinquished her rights under, or agreed to the cancellation of, the salary continuation agreement as an integral part of the sale to BYU. She is not entitled to a charitable contribution deduction for the value of the agreement.[25] *Sarah Marquis*, 49 T.C. 695, 702 (1968) ; *Jordon Perlmutter*, 45 T.C. 311, 316–317 (1965).

## Issue 9. Dividend from Strain Brothers

Respondent determined that Russell and Arthur (or Harriet) realized constructive dividends from Strain Brothers as a result of the transfer of the Strain Ranch and related equipment to the founda-

[25] Parenthetically, we note that Harriet's receipts under the salary continuation agreement may have constituted "income in respect of a decedent" within the meaning of sec. 691. *Miller* v. *United States*, 389 F.2d 656 (C.A. 5, 1968) ; *Mary Tighe*, 33 T.C. 557 (1959) ; Ferguson, "Income and Deductions in Respect of Decedents and Related Problems," 25 Tax L.Rev. 5, 36 (1969–70). Sec. 1.691(a)–4(a), Income Tax Regs., provides that if the right to receive such income "is disposed of by gift, the fair market value of the right at the time of the gift must be included in the gross income of the donor." Respondent has not sought to include the January 1964 value of the salary continuation agreement in Harriet's income, and we are not called upon to apply sec. 691. However, it appears that any charitable contribution to which she would be entitled under her interpretation of the facts would be offset by at least an equal amount of income.

tions in October of 1963. Russell and Harriet contend: (1) That Strain Brothers never owned the ranch and related equipment and, therefore, could not have distributed it as a dividend; (2) that neither Russell nor Arthur (nor Harriet) was a stockholder in Strain Brothers at the time of the transfer and, therefore, could not have received such a dividend; and (3) that the transfer was merely a charitable contribution by Strain Brothers and did not constitute a constructive dividend.

As to the first argument, it is true that Strain Brothers was not record owner of the ranch. Record title was vested in Russell and Arthur as trustees for their families. However, the fact that record title was not in the corporation is not in itself controlling since under Montana law unrecorded transfers are effective as between the parties. Mont. Rev. Codes Ann. sec. 73-205 (1962).[26]

We think Russell and Arthur at some point conveyed the ranch to Strain Brothers. The corporation consistently reported the losses from the operation of the ranch on its financial statements and deducted them in its income tax returns. Similarly, it deducted the depreciation on the improvements and the equipment used on the ranch,[27] as well as the taxes paid on the ranch property. While Russell testified that Strain Brothers operated the ranch under an informal lease arrangement with the trustees, no deductions were claimed by Strain Brothers for rental payments on either the ranch or the equipment. Furthermore, Strain Brothers' balance sheets listed both the ranch and the equipment among its assets, and Strain Brothers, along with Russell and Harriet, executed overlapping deeds at the time the ranch was transferred to the foundations. In the face of this record, we cannot find that Strain Brothers did not own the ranch and farm equipment at the time it was conveyed to the foundations.

Petitioners next argue that neither Russell nor Arthur (nor Harriet) owned any stock in Strain Brothers at the time of the distribution and therefore cannot be taxed on any dividends paid by it. We do not agree.

It is true that in June of 1963 Russell and Arthur transferred their stock in Strain Brothers to trusts which they created at that time and that the trusts owned the stock in October of 1963 when the distribution of the ranch was made. However, Russell and Arthur (until his death) continued to control the corporation as officers and as stockholder-trustees, and to enjoy the benefits of dividends paid by the

---

[26] Mont. Rev. Codes Ann. sec. 73-205 (1962) provides:

UNRECORDED INSTRUMENTS VALID BETWEEN THE PARTIES. An unrecorded instrument is valid as between the parties and those who have notice thereof.

[27] The income tax return of Strain Brothers in 1963 reflects that some of the improvements were apparently already fully depreciated so that no depreciation was claimed for them.

corporations through their status as life income beneficiaries of the trusts.

As grantor and sole life income beneficiary of the two trusts which he created, Russell is taxable on the dividends received by those trusts. Secs. 671, 677. Although Arthur was dead at the time of the distribution by Strain Brothers, Harriet filed a joint return for him and herself, see sec. 6013(a) (3), and upon his death she became the life income beneficiary of the trusts which he had created. Since Arthur's trusts provided for the current distribution of all the annual net income to Harriet, she is taxable on the dividends received by the trusts, secs. 651, 661, and she and Arthur's estate are jointly and severally liable for the taxes due as a result of those constructive distributions, sec. 6013(d) (3).

Petitioners, finally, maintain that the distribution did not constitute a dividend at all but rather was a charitable contribution by Strain Brothers to the foundations. We do not agree.

In general, any distribution by a corporation to its stockholders out of its earnings and profits constitutes a dividend. Sec. 301(a). While not every distribution made by a corporation without adequate consideration is a dividend, e.g., *W. B. Rushing*, 52 T.C. 888 (1969), affd. 441 F.2d 593 (C.A. 5, 1971), it is not necessary that a distribution be paid directly to the shareholders. Dividend treatment results from those corporate distributions to third parties which satisfy the stockholders' legal obligations, e.g., *Schalk Chemical Co.* v. *Commissioner*, 304 F.2d 48, 50 (C.A. 9, 1962), affirming 32 T.C. 879 (1959) ; *Edgar S. Idol*, 38 T.C. 444, 457–458 (1962), affd. 319 F.2d 647 (C.A. 8, 1963), carry out the stockholders' wishes to make gifts to others, e.g., *Harry L. Epstein*, 53 T.C. 459, 474–475 (1969), or are otherwise made primarily for the benefit of the stockholders, e.g., *Challenge Manufacturing Co.*, 37 T.C. 650 (1962), acq. 1962–2 C.B. 4 [payments of stockholder's personal expenses]. We find that the distributions in this case were made primarily for the benefit of the Strains.

The evidence shows that Russell and Arthur were willing to part with Strain Brothers but were not willing to relinquish control over the Strain Ranch which contained their families' summer cabins. In order to insure their continued possession of the ranch they, as officers and directors of Strain Brothers and as trustees of the Strain trusts, transferred ownership of the ranch to the foundations which they had created. These foundations, controlled by the Strain families, allowed the Strains to use the ranch as they had while it was owned by Strain Brothers. Although Russell and Harriet, after the transfer, paid rent to the foundations for the continued use of the cabins during 1964 and 1965, these payments did not cover the costs of operating and

maintaining the ranch; as discussed above in respect of Issue 7, additional amounts were contributed to the foundations by the Strains to make up this deficit. After 1965, the Strains no longer paid rent for the cabins, but they continued to make the contributions needed to cover the expenses of maintaining the ranch. Petitioners have shown no reason why the foundations retained the ranch—a losing business venture—other than the Strains' wish to use its facilities. At least to the extent of owning and maintaining the ranch, the foundations were merely instrumentalities organized and operated for the benefit of the Strains. The distribution, though made in form to the foundations, were dividends to the Strain trusts. Cf. *C. F. Mueller Co.*, 55 T.C. 275, 304 (1970).

It is clear from the evidence that the transfer of the Strain Ranch to the foundations was motivated by family and not business reasons. *Byers* v. *Commissioner*, 199 F.2d 273, 275 (C.A. 8, 1952), affirming a Memorandum Opinion of this Court, certiorari denied 345 U.S. 907 (1953). The transfer to the foundations was not made in an effort to benefit the public in general, but only to assure that the Strains would continue to possess and enjoy the property for as long as they wished to do so. This transfer of assets from Strain Brothers, though made to the foundations, constitutes a dividend. Cf. *Worcester* v. *Commissioner*, 370 F. 2d 713 (C.A. 1, 1966), affirming in part a Memorandum Opinion of this Court; *Equitable Publishing Co.* v. *Commissioner*, 356 F.2d 514 (C.A. 3, 1966), affirming per curiam on this point a Memorandum Opinion of this Court, certiorari denied 385 U.S. 822 (1966); *Biltmore Homes, Inc.* v. *Commissioner*, 288 F. 2d 336 (C.A. 4, 1961); *C. F. Mueller Co., supra; Percy H. Clark*, 31 B.T.A. 1082, 1084 (1935), affd. 84 F. 2d 725 (C.A. 3, 1936); *Security First Nat. Bank of Los Angeles, Executor*, 28 B.T.A. 289, 310–311 (1933).

### *Issue 10. Capital Loss—Raymond P. and Mary Jean Murphy*

In docket No. 2914–68, respondent disallowed a capital loss which petitioners Raymond P. Murphy and Mary Jean Murphy had claimed on their returns for 1964. No evidence was introduced relating to this issue. The burden of proof being on petitioners, the issue must be decided for respondent.

### *Issue 11. Losses Incurred by Partnerships Farrwest and Graygold*

As detailed in our Findings, the trustee of Edgar Trusts CR–1 and CR–2, in 1962, invested the corpora in two limited partnerships, Farrwest and Graygold. These partnerships incurred net operating losses in 1962, 1963, and 1964, and Edgar, grantor and life income beneficiary

of the trusts, deducted in his returns for those years the portion of the losses allocable to and deductible by the trusts under section 702(a). Respondent disallowed the deductions, determining that Edgar had "not established that * * * [he was] a partner of these partnerships" or that he was "otherwise entitled to deduct such an amount in the computation of taxable income." Respondent urges that the trusts, rather than Edgar, were partners, and the "loss must be charged to the capital of * * * [the trusts], which fact renders it nondistributable to * * * [Edgar]," who is entitled only to trust income.

Whether Edgar is entitled to deduct the trusts' shares of the losses depends upon the application of sections 671 and 677. In pertinent part, the latter section provides:

(a) GENERAL RULE.—The grantor shall be treated as the owner of any portion of a trust, * * * whose income without the approval or consent of any adverse party is, or, in the discretion of the grantor or a nonadverse party, or both, may be—

(1) distributed to the grantor;

Section 671 provides:

Where it is specified in this subpart [which includes section 677] that the grantor * * * shall be treated as the owner of any portion of a trust, there shall then be included in computing the taxable income and credits of the grantor * * * those items of income, deductions, and credits against tax of the trust which are attributable to that portion of the trust to the extent that such items would be taken into account under this chapter in computing taxable income or credits against the tax of an individual. Any remaining portion of the trust shall be subject to subparts A through D. * * *

The key language in section 671 is "those items of income, deductions, and credits * * * attributable to that portion of the trust" of which the grantor is treated as owner. This language must be read, of course, in conjunction with section 677, which says that the grantor is to be treated as the owner of "any portion of a trust" whose income may be distributed to him. Edgar argues that since he reserves all the net income from the trusts, he is to be treated as owner of the corpus and, is consequently, entitled to "deductions" for the trusts' shares of the partnership losses. We do not agree.

The crucial question is whether the partnership losses are "attributable" to Edgar's income interests within the meaning of section 671. Where a trust is divided into fractional interests of both the income and corpus, a prorata share of the "items of income, deduction, and credit" is ordinarily allocated to each interest. Sec. 1.671–3(c), Income Tax Regs. Similarly, if the portion treated as owned by the grantor consists of specific trust property, all items directly related to that property are attributable to such portion. Sec. 1.671–3(a)(2), Income Tax Regs. The more difficult problem arises where, as in the instant

case, the trust is divided into income and remainder interests, with current net income being distributed to the grantor and capital gains being added to principal. Compare sec. 1.671–3(a)(1) and sec. 1.677 (a)-1(g), example (1), Income Tax Regs. In such circumstances, a determination must be made as to whether each item is properly attributable to the income or the remainder portion of the trust.

We think the guiding principle in this last situation—the factual situation here presented—is stated in sec. 1.671–3(c), Income Tax Regs., as follows:

if the grantor or another person is treated as owner solely because of his interest in or power over ordinary income alone, he will take into account in computing his tax liability those items [of "income, deduction, and credit"] which would be included in computing the tax liability of a current income beneficiary, including expenses allocable to corpus which enter into the computation of distributable net income.

The rules for computing the tax liability of a "current income beneficiary" are set forth in subparts A through D, part I, subchapter J of the Code. Generally speaking, a trust and its beneficiaries are treated as separate and distinct taxable entities. The broad general rule is that the income of a trust is taxable to the fiduciary, and his taxable income is computed in the same manner as in the case of an individual, sec. 641(b), with specified exceptions. One exception is that a deduction is allowable for income which is distributed currently. Secs. 651 and 661. No provision is made, however, for the distribution of a trust's losses to its beneficiaries, and no provision is made for a beneficiary to deduct the losses of a trust of which he is the beneficiary. Indeed, section 642(d) specifies that "The benefit of the deduction for net operating losses provided by section 172 shall be allowed to estates and trusts," thus indicating that they are not distributable to the beneficiaries. The last clause of section 1.671–3(c), *supra*—"including expenses allocable to corpus which enter into the computation of distributable net income"—does not include losses of capital incurred in the operation of a business. *Mellott* v. *United States*, 257 F.2d 798 (C.A. 3, 1958); *George W. Vreeland*, 16 T.C. 1041, 1049–1050 (1951); *George W. Balkwill*, 25 B.T.A. 1147 (1932), affd. 77 F.2d 569 (C.A. 6, 1935), certiorari denied 296 U.S. 609 (1935); *George M. Studebaker et al.*, 2 B.T.A. 1020 (1925).

In addition, this rule for apportioning the items of income, deductions, and credits of a trust between its ordinary income and remainder portions was previously contained in section 29.167–1(c), Regs. 111, which interpreted 1939 Code section 167. That section corresponds to section 677 of the 1954 Code. S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., pp. 86, 371 (1954). Under the 1939 Code rule, expenses chargeable to corpus were not deductible by the income beneficiary. *George B. Markle, Jr.*, 17 T.C. 1593, 1599–1600 (1952).

Finally, the economic effect of losses does not fall on the current income beneficiary. Under trust law, when a trustee is empowered to continue the operation of a business, any net losses incurred by the business are allocated to corpus and are not set off against income received in later years. Revised Uniform Principal and Income Act, sec. 8(a), Uniform Principal and Income Act, sec. 7(4); Restatement, Trusts 2d, sec. 233, comment (c). Thus, the tax law accords with the economic realities.[28]

This holding is consistent with the fact that Edgar was previously allowed charitable contribution deductions for the values of the remainder interests in the trusts. A contrary holding would, in effect, allow him at least a partial double deduction—a deduction for the value of the charitable remainder interest in the corpus and a deduction for the part of the corpus consumed by such losses. We do not think sections 671 and 677 were intended to confer such largess.

### Issue 12. Penalties—Trusts' Failures to File Returns

Section 6651(a) provides for an addition to the tax for failure to file a timely return, unless it is shown that such failure is "due to reasonable cause and not due to willful neglect." The addition is computed as a percentage of the tax. Under our Findings, only the CR–1 trusts created by Russell and Arthur had taxable income in 1964, the year for which the additions were determined. The penalty does not, therefore, apply to any of the other trust petitioners. *Freeman P. Walker*, 37 T.C. 962, 973 (1962), affirmed on this issue 326 F.2d 261 (C.A. 9, 1964).

As to the CR–1 trusts created by Russell and Arthur, section 6012 (a)(4) requires income tax returns to be filed by every trust having "any taxable income, or having gross income of $600 or over, regardless of the amount of taxable income." Each of these trusts realized gain on the BYU sale of stock and received interest income during 1964 far in excess of the $600 specified by that section; each was, therefore, required to file a return by April 15, 1965. The returns were not filed until March 14, 1966. The only explanation offered for this delay in filing returns is argument on brief that the complexity of the tax

---

[28] Sec. 1.642(d)–1, Income Tax Regs., provides that, in computing a net operating loss, "a trust shall exclude that portion of the income and deductions attributable to the grantor or another person under sections 671 through 678." However, as discussed above, since Edgar has only an interest in the income and no interest in the corpus, his deductions are to be computed as if he were a "current income beneficiary" rather than as a grantor. In addition, contrast sec. 642(e), which provides that "An estate or trust shall be allowed the deduction for depreciation and depletion only to the extent not allowable to beneficiaries," and sec. 167(h), which states that "In the case of property held in trust, the allowable deduction shall be apportioned between the income beneficiaries and the trustee in accordance with the pertinent provisions of the instrument creating the trust, or, in the absence of such provisions, on the basis of the trust income allocable to each." None of these special provisions applies to partnership losses of a trust.

problems presented in this proceeding provides adequate justification. We do not think that this argument is sufficient to show reasonable cause within the meaning of section 6651(a).

*Issue 13. Penalties—Edgar's Negligent or Intentional Disregard of Rules and Regulations*

Edgar filed a timely personal income tax return for 1964 in which he understated his gross income and, consequently, his income tax liability. Respondent determined that a part of the underpayment was "due to negligence or intentional disregard of rules and regulations" within the meaning of section 6653(a) and determined that the 5-percent penalty provided for in that section is applicable. Although we have sustained some of the adjustments made in his income tax return, we do not think the manner in which Edgar computed the tax reported in his return was so clearly wrong as to warrant a finding that he was negligent or intentionally disregarded the rules and regulations. Accordingly, the additions to tax under section 6653(a) do not apply.

*Decisions will be entered under Rule 50.*