Bert C. Cochran and Edythe L. Cochran v. Commissioner.
Cochran v. Commissioner
Docket No. 6394-67.
United States Tax Court
T.C. Memo 1972-15; 1972 Tax Ct. Memo LEXIS 239; 31 T.C.M. (CCH) 36; T.C.M. (RIA) 72015; January 19, 1972, Filed. William T. Brandlin, 611th W. 6th, Los Angeles, Calif. for the petitioners. H. Lloyd Nearing, for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined a deficiency in petitioners' Federal income tax for 1965 in the amount of $9,147.86. The issues for decision are: (1) Whether a sum equal to the difference between the fair market value of an apartment building and the price paid for it by petitioner Bert C. Cochran constitutes a commission for his services as a real estate broker; and, if so, (2) what was the fair market value of *240 the apartment building in 1965. Findings of Fact Petitioners, Bert C. Cochran and Edythe L. Cochran, were husband and wife during 1965. They filed their joint income tax return for that year with the district director of internal revenue, Los Angeles, California. At the time their petition was filed herein, Bert C. Cochran was a legal resident of Los Angeles, California, and Edythe L. Cochran was a legal resident of Monterey Park, California. Edythe L. Cochran (hereinafter Edythe) is a petitioner in this case solely by virtue of having filed a joint income tax return with her husband. Subsequent to 1965, Edythe and Bert C. Cochran (hereinafter petitioner) were divorced. At the time of the divorce, he was awarded, as his sole property, the apartment building located at 1815 North Bronson Avenue, Los Angeles, California. In addition, he was ordered to hold Edythe harmless from liability for any deficiency in Federal income tax for 1965. Respondent has conceded that, pursuant to section 6013(e), Internal Revenue Code of 1954, [1] Edythe is not liable for any deficiency determined herein. *241 During 1964 and 1965, petitioner was a self-employed real estate broker, licensed by the State of California, doing business as Bert Cochran Associates. In 1964, he approached Lawrence Dexter Long (hereinafter Long), who owned an 89-unit apartment complex known as the Kona Kai Apartments, located in Torrance, California, with a view to obtaining the right to list the apartment for sale and to serve as the broker. Long agreed to list the buildings with petitioner on a net conversion listing. This meant that the seller, Long, wished to obtain a specified amount as the net selling figure. In August 1964, petitioner, in his capacity as real estate broker, arranged for a partnership, composed of himself and his wife, Iras M. Fine (hereinafter Fine) and his wife, and Arthur M. Gameral (hereinafter Gameral) and his wife, to offer to buy the Kona Kai Apartments. Although negotiations were held between the prospective buyers and Long, an agreement could not be reached, and the sale did not take place. Shortly thereafter, Long was killed in an airplane crash, and the Kona Kai Apartments passed to his estate. In October 1964, petitioner approached Long's widow to ascertain whether Long's *242 Estate (hereinafter referred to as the 37 Estate) was still interested in selling the Kona Kai Apartments. After receiving a positive response, petitioner, in his capacity as real estate broker on behalf of the Estate, negotiated another deal for the sale of the apartment buildings and certain personal property located therein. The prospective buyers were to be Gameral, Fine, and petitioner, acting through a new partnership. The partnership was formed in January 1965; however, on March 3, 1965, the deal was not consummated, and the partnership was dissolved as of its inception. Upon the dissolution, petitioner received $10,000 from Fine and Gameral for his 1/6 interest. On March 17, 1965, the Estate, through the efforts of petitioner, sold the Kona Kai Apartments and certain personal property to Gameral for $901,500. One of the items of consideration which Gameral gave in exchange for the Kona Kai Apartments was a 10-unit apartment located at 1815 North Bronson Avenue in Los Angeles (hereinafter this property will be referred to as the Bronson property). In addition, Gameral assumed an existing trust deed on the buildings held by the Home Savings & Loan Association, and executed *243 a second trust deed to be held by the seller. In consideration for the transfer of the personal property, Gameral assumed an existing encumbrance and paid a specified amount of cash. The following table summarizes the consideration and value thereof received by the seller, the Estate, from the buyer, Gameral, pursuant to the negotiated sale of the apartment buildings and the related personal property: Consideration
Value
Assumption of existing trust deed
$680,000.00
Second trust deed
64,500.00
Bronson property
70,000.00
Assumption of existing encumbrance on personalty
17,000.00
Cash 70,000.00
Total
$901,500.00
The escrow instructions to the Crocker-Citizens National Bank, the escrow agent, covering the sale of the apartments provided for the purchase of title insurance with a liability of $70,000 covering the Bronson property. In addition, $77 worth of internal revenue stamps were placed on the deed covering this property. These stamps represented a value for the property of $70,000. Other documents filed with the probate court reflect that the Bronson property had a value of $70,000. As compensation for petitioner's services as broker, the Estate *244 concluded that $35,000 was a fair and reasonable broker's commission. As a result of negotiations and subject to the approval of the probate court administering the Estate, petitioner and the Estate agreed that petitioner would purchase the Bronson property for $35,000. The balance of the value on the property, $35,000, was to be treated as the commission for his services in arranging the sale of the Kona Kai Apartments. The probate court approved the transaction, and in the "Order Confirming Sale of Real Property" summarized the transaction as follows: The Administratrix of the decedent's estate entered into a contract with * * * [petitioner], to procure a purchaser for the property, which contract provided for the payment to the agent out of the proceeds of sale made and confirmed by the Court to any purchaser secured by the agent, of a commission, the amount of which and nature of which to be fixed and allowed by this Court upon confirmation of the sale. The agent procured the purchaser to whom the real property was sold, and the sum of $35,000.00 is a reasonable amount to be allowed as such commission to such broker. Said $35,000.00 to be paid to broker by conveying to him *245 by Grant Deed executed by Administratrix * * * [the Bronson property] having a total value of $70,000.00, after said broker pays to the Estate by way of a Deed of Trust secured by promissory note in the sum of $35,000.00, * * * the balance of the purchase price: $35,000.00. * * * 2. The sum of $35,000.00 is fixed and allowed by the Court as a commission to * * * [petitioner] for securing the purchaser * * * and the Administratrix hereby is authorized and directed to convey to said broker * * * upon receipt from said broker of his Deed of Trust secured by promissory note for $35,000.00 * * *. Petitioner thus received the Bronson property, which had a value of $70,000, in exchange for a note in the amount of $35,000. The $35,000 balance of the value of the property constituted his commission for his services in procuring a purchaser for the Kona Kai Apartments. Petitioner, in his 1965 joint income tax return, did not report as income the difference between the fair market value of the Bronson property and the price paid by him. 38 In his notice of deficiency, respondent determined that petitioner received commission income of $35,000 from the Estate of Long by purchasing *246 the Bonson property for $35,000 less than its fair market value. Ultimate Findings of Fact (1) The difference between the fair market value of the Bronson property and the price paid for it ($35,000) constitutes petitioner's commission for his services in procuring a purchaser for the Kona Kai Apartments. (2) The fair market value of the Bronson property at the time of the sale to him by the Estate of Long in 1965 was $70,000. Opinion The principal issue is whether petitioner received a commission for his services as broker for the Estate measured by the difference between the price he paid for the Bronson property and the fair market value of that property. Petitioner contends that the only commission he received for his services was the 1/6 interest in the partnership which was formed in 1965 for the purpose of purchasing the Kona Kai Apartments but which was dissolved before the purchase occurred. Petitioner argues that upon dissolution he received $10,000 for his interest from the other two partners and that this was the full extent of his commission. He maintains that any difference between the fair market value of the Bronson property and the price he paid therefor *247 merely represents "a good buy." Respondent contends that the difference is a commission for petitioner's services and, as such, is income to him. [2] Resolution of the issue framed by the contentions of the parties depends entirely upon the facts of the case. In support of his contentions, petitioner introduced evidence attempting to show that: (1) The agreement between the parties called for a net listing of $866,500 *248 with no commission to be paid to petitioner; (2) The agreement provided for a commission to petitioner from the buyers; and (3) The value for the Bronson property was artificially inflated in the negotiations in order to satisfy the holder of the first trust deed, Home Savings & Loan Association, that the purchasers had sufficient equity in the property to justify consent to their assumption of the first deed of trust. The evidence introduced by petitioner consisted almost exclusively of his own oral testimony. He did not present any documents signed by both parties which showed the actual terms of the agreement, and he introduced no evidence to corroborate his oral testimony with regard to the equity requirements of the Home Savings & Loan Association for the assumption of the deeds of trust. Furthermore, there is substantial evidence refuting petitioner's position. Several documents which were filed with the probate court in connection with the administration of the Estate recite that the consideration received by the Estate included the Bronson property valued at $70,000. These documents include the escrow instructions to the Crocker-Citizens National Bank on the Kona Kai *249 Apartments property, signed by both the Estate and the purchasers; the "Return of Sale of Real Property and Petition for Order Confirming Sale," signed by the Administratrix of the Estate; and the "Order Confirming Sale of Real Property." In addition, in a document, entitled "Acceptance by Personal Representative of Bid for Purchase of Real Property," signed by petitioner and filed with the probate court, it was recited that the Estate of Long would pay petitioner for his services from the proceeds of the sale in the following manner: The balance of the consideration of Thirty-Five Thousand ($35,000.00) Dollars over and above the Thirty-Five Thousand ($35,000.00) Dollars to be received by the estate in the form of a thirty (30) day note * * * is being waived in lieu of commission payable to * * * [petitioner] as commission on the entire transaction, including the sale of the personal property * * *. There is also in evidence testimony from the attorney representing the administratrix of the Long Estate to the effect that the Estate was prepared to pay petitioner 39 his commission in cash in lieu of the Bronson property, but that petitioner told him that he did not want cash. *250 [3]
In summary, we are confronted with evidence which is conflicting. Petitioner's position is supported almost exclusively by his oral testimony; respondent's position is supported by written documents and the oral testimony of the attorney for the estate. In light of the clear and unequivocal recitals in the documents and the supporting testimony, we must find that the difference between the fair market *251 value of the Bronson property and the price paid by petitioner represents a commission to him and is therefore includable in his income for 1965. The remaining issue involves a determination of the fair market value of the Bronson property at the time petitioner purchased it from the Estate of Long. Petitioner testified that the value recited in the numerous documents relating to the sales transaction as artificially inflated to satisfy the equity requirements of the Home Savings & Loan Association. He introduced no evidence, however, to support this contention. In fact, by his own admission, the property had a value in excess of $35,000 at the time he purchased it. In addition, the evidence showed that petitioner secured a $49,000 loan on the Bronson property shortly after acquiring it. Since the law of California[4] does not permit a savings and loan association to make a secured loan on real property in an amount in excess of 70 percent of the appraised value, we conclude that the property had an appraised value of at least $70,000. *252 In light of all the evidence surrounding the value of the Bronson property at the time of the sale, including the value of revenue stamps placed on the deed of transfer, the value of the property shown in all the papers documenting the sale, and the testimony of the witnesses, we are convinced that the fair market value of the Bronson property at the time petitioner purchased it from the Estate was $70,000. The difference of $35,000 between the fair market value and what petitioner paid for the property, consequently, represents his commission for his services as broker in arranging the entire transaction. Decision will be entered for the respondent. Footnotes
1. Section 6013(e)(1) provides, in part, that if: (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein * * * in excess of 25 percent of the amount of gross income stated in the return. (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) * * * it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax * * * to the extent that such liability is attributable to such omission from gross income.↩
2. Sec. 1.61-2(d)(2), Income Tax Regs., provides, in part, that: if property is transferred to an independent contractor, as compensation for services for an amount less than its fair market value, then regardless of whether the transfer is in the form of a sale or exchange, the difference between the amount paid for the property and the amount of its fair market value at the time of the transfer is compensation and shall be included in the gross income of the * * * independent contractor. See also: Glenn E. Edgar, 56 T.C. 717, 746↩ (1971). Petitioner does not challenge the applicability of this principle, assuming a finding is made that the value of the property exceeded the price paid and that this excess value represented a commission to him.
3. Paul Mast, attorney for the Estate of Long, testified as follows with respect to a telephone conversation he had with petitioner concerning the sale of the Bronson property to petitioner: I spoke to him on the telephone, and I told him that the estate in lieu of giving him the Bronson property for $35,000. would pay him his commission of $35,000 in cash. Mr. Cochran replied to that that he did not want the $35,000 in cash, because if he received the $35,000 in cash, he would have to pay tax on it. I told Mr. Cochran, that it didn't make any difference whether he received it in cash or in property, that he would still have to pay tax on it. Mr. Cochran then advised me that this was up to him, and I shouldn't concern myself with it, but he would not accept the cash.↩
4. West Ann. Cal. Code, Financial, sec. 7152 provides: An association may make amortized loans upon the security of improved real property in an amount not in excess of 70 percent of the appraised value of such property.↩